Filed 4/17/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054926 |
| v. | (Super.Ct.No. FSB903492) |
| CARLOS DUBOSE et al., | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendants and Appellants. | |
| | [NO CHANGE IN JUDGMENT] |


The petition for rehearing is denied.  The opinion filed in this matter March 25, 2014, is modified as follows:

1.      The last paragraph on page three of the opinion is modified as follows:

"Fourth, Dubose asserts an LWOP sentence for a minor is cruel and unusual punishment.  Fifth, Dubose contends the LWOP sentence is unconstitutional because the jury did not find Dubose intended to kill the victim.  Sixth, Dubose asserts it is unconstitutional to impose an LWOP sentence via a mandatory sentencing scheme that does not permit consideration of mitigating factors.  Seventh, Dubose contends the trial court erred in sentencing him because it was unaware it had the authority to sentence

1

him to a prison term of 25 years to life.  (§ 190.5, subd. (b).)  Eighth, Dubose asserts the trial court relied on incorrect factors in determining his sentence.  We remand the Dubose matter for a resentencing hearing, wherein the trial court may exercise its discretion regarding the LWOP sentence, but otherwise affirm the judgment.

2.	The first paragraph on page 32 of the opinion is modified as follows:

"Accordingly, we must consider whether there was anything in the manner in which the case was charged and tried, or the jury instruction, or in the arguments of counsel, which would foreclose the trial court from considering all the evidence at trial in making a sentencing decision under section 654, i.e., selecting the underlying felony. The jury instruction limited the trial court to selecting carjacking, robbery, or torture as the underlying felony."

Except for these modifications, the opinion remains unchanged.  The modifications do not affect a change in the judgment.

CERTIFIED FOR PUBLICATION


MILLER      
          J.

We concur:


RICHLI     
    Acting P.J.


KING     
    J.

Filed 3/25/14 (unmodified version)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054926 |
| v. | (Super.Ct.No. FSB903492) |
| CARLOS DUBOSE et al., | OPINION |
| Defendants and Appellants. | |


APPEAL from the Superior Court of San Bernardino County. Duke D. Rouse, Judge. (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed in part; reversed in part and remanded for resentencing.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Dubose.

David L. Kelly, under appointment by the Court of Appeal, for Defendant and Appellant Davion Whitmore.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

This case concerns two defendants and appellants, Carlos Dubose (Dubose) and Davion Whitmore (Whitmore). Dubose and Whitmore were minors at the time they committed the offenses at issue in this case, but they were charged and sentenced as adults. (Welf. & Inst. Code, § 707, subd. (d)(1).) A jury found Dubose guilty of (1) first degree murder (Pen. Code, § 187, subd. (a)); (2) carjacking (Pen. Code, § 215, subd. (a)); (3) robbery (§ 211); (4) kidnapping for purposes of committing robbery (Pen. Code, § 209, subd. (b)(1)); and (5) fleeing a pursuing peace officer (Veh. Code, § 2800.2, subd. (a)).

A jury found true the allegations that Dubose used two deadly or dangerous weapons during the murder, carjacking, robbery, and kidnapping. (Pen. Code, § 12022, subd. (b)(1).)[1] The jury found true the special circumstances allegations that Dubose murdered George Onyango (the victim), while committing (1) a robbery, and (2) a carjacking. (§ 190.2, subd. (a)(17).) The jury also found true the special circumstances allegation that Dubose intentionally murdered the victim and the murder involved torturing the victim. (§ 190.2, subd. (a)(18).) The trial court sentenced Dubose to prison for a determinate term of five years, four months, plus an indeterminate term of

_____

[1] All subsequent statutory references will be to the Penal Code, unless indicated.

2

life without the possibility of parole (LWOP) to be followed by a term of life with the possibility of parole.

Dubose raises eight issues on appeal; the first three concern jury instructions, while the last five address his LWOP sentence. First, Dubose contends the torture finding must be reversed because conflicting jury instructions permitted the jury to find the allegation true without finding Dubose possessed the requisite intent to kill. Second, Dubose asserts the trial court erred by not instructing the jury it must unanimously agree on the special circumstances findings. Third, Dubose contends the trial court lowered the prosecutor's burden of proof by instructing the jury the prosecutor did not need to prove a motive in the crime of "kidnapping for [purposes of committing a] robbery."

Fourth, Dubose asserts an LWOP sentence for a minor is cruel and unusual punishment. Fifth, Dubose contends the LWOP sentence is unconstitutional because the jury did not find Dubose intended to kill the victim. Sixth, Dubose asserts it is unconstitutional to impose an LWOP sentence via a mandatory sentencing scheme that does not permit consideration of mitigating factors. Seventh, Dubose contends the trial court erred in sentencing him because it was unaware it had the authority to sentence him to a prison term of 25 years to life. (§ 190.5, subd. (b).) The People agree with this seventh contention and concede the matter should be remanded so the trial court may exercise its discretion concerning Dubose's sentence. Eighth, Dubose asserts the trial court relied on incorrect factors in determining his sentence. We remand the Dubose matter for a resentencing hearing, wherein the trial court may exercise its discretion regarding the LWOP sentence, but otherwise affirm the judgment.

3

A jury found Whitmore guilty of (1) first-degree murder (§ 187, subd. (a)); (2) carjacking (§ 215, subd. (a)); (3) robbery (§ 211); and (4) kidnapping for purposes of committing robbery (§ 209, subd. (b)(1)). The trial court sentenced Whitmore to prison for a determinate term of one year, eight months, plus indeterminate terms of (1) 25 years to life, plus (2) life with the possibility of parole. Whitmore contends the trial court erred by not applying section 654 to his sentences for carjacking and kidnapping. We reverse Whitmore's sentence on all counts and direct the trial court to resentence Whitmore.

## FACTUAL AND PROCEDURAL HISTORY

The victim was an adult male who worked as a counselor at the Aiming High Treatment Group Home in Yucaipa. The victim was a single father to two children; he attended law school, and worked at the group home at night. The group home was a three-bedroom house, with a living room and kitchen. The counselor on duty had keys to the locked cabinets and doors in the house. The counselors kept money (belonging to residents and the facility), food, medicine, a clothing iron, and kitchen utensils in the locked cabinets and closets. Although two counselors were on duty at the home during the day, only one counselor was on duty at the home during the night.

In August 2009, five or six boys were living at the group home. All the boys were placed in the home by the courts as part of the boys' terms of probation. Dubose and Whitmore (collectively "defendants") were residents at the group home. Defendants were friends. Defendants' bedrooms were across the hallway from one

4

another.  Whitmore had his own bedroom, while Dubose shared a room with Richard Maldonado (Maldonado).

On August 22, 2009, Whitmore was upset because the probation department denied him a weekend pass to go home.  One of the daytime group home counselors, Albert Williams (Williams) spoke to Whitmore about "calming himself down."  In the "later part of the evening," Williams noticed defendants "were staying to themselves a lot and whispering a lot among themselves, and when [Williams] asked what was going on, they would say nothing."

Williams spoke about defendants' behavior with the second daytime counselor, Delia Brown (Brown).  Brown and Williams decided to observe defendants a "little closer" during their shift.  Leroy Ryan (Ryan), another resident of the group home, overheard Whitmore say something to Dubose about "going along with the plan." Dubose "nodded and said 'yeah.'"  Approximately two months prior, Ryan heard defendants discuss stealing the "house money," which was like petty cash, and running away to Los Angeles.

When the victim began his night shift, Brown and Williams advised him "to be very careful," because "Whitmore was pacing a lot, talking to himself a lot"; however, he was not "showing any signs of violence."  Williams believed defendants might run away from the group home that night.  Williams stayed approximately 30 minutes after his shift ended, until 10:30 p.m., in order to make sure the victim would be okay as the only counselor in the house that night.  When Williams left, the cabinets were locked and it appeared to Williams all the boys were in bed for the night.

5

Dubose did not go to bed.  Dubose took his clothes and hangers from the closet and placed them on the floor.  Dubose then removed the wooden rod from the closet that the clothes hung on.  Dubose sat on his bed with the wooden rod for approximately 10 minutes and then went into the hallway to speak with Whitmore.  The victim told defendants to go back to bed.  Dubose struck the victim's back with the wooden rod, causing the victim to fall down.  Whitmore laughed and began punching and kicking the victim.  The victim put his hands up with his palms out to defend himself.  The victim screamed, "'Leave me alone, take everything.'"

The beating took place in the hallway for several minutes, with the victim being punched, kicked, and struck with the rod.  Dubose swung the rod from over his head.  The victim begged for his life.  The victim tried to exit the house by moving down the hallway, but Dubose followed the victim, and caused the victim to move further back into the hallway, eventually arriving in Whitmore's bedroom.

The beating continued in Whitmore's bedroom.  Eventually the victim stopped screaming.  Dubose went into the bedroom he shared with Maldonado.  Dubose had blood on him.  Dubose told Maldonado, "'Better not snitch,'" which meant he should not testify.  Dubose retrieved clothes from the bedroom.  Whitmore went into Ryan's bedroom.  Whitmore took sheets from Ryan's roommate's bed and some clothes.  Dubose told Whitmore to "'hurry up.'"

Eventually, the house became quiet.  Maldonando exited his bedroom and saw pools of blood and a trail of blood in Whitmore's bedroom.  Maldonando could hear the victim "trying to catch his breath."  It sounded as though the victim was inside a closet,

6

which was locked. Maldonando went to Ryan's bedroom and told him about the blood he saw. Ryan called his grandmother and asked her to call the group home manager. Ryan and Maldonando received permission from the manager to kick open the closet door.

Maldonando kicked the closet door open. Maldonando and Ryan saw the victim inside the closet, tied up with sheets and extension cords. The victim did not speak, he "was just trying to catch his breath." While waiting for paramedics and law enforcement to arrive, Ryan noticed all the cabinets and drawers in the kitchen and garage were open. Ryan also noticed the victim's car was not in the garage, which was where the victim typically parked it.

On the night of August 22, 2009, CHP Officer Goulding saw the victim's car on westbound Interstate 10. The car was weaving across lanes of traffic and fluctuating between speeds of 65 and 80 miles per hour. Officer Goulding and his partner activated their car's red flashing lights. The victim's car accelerated and weaved through traffic. Officer Goulding contacted CHP dispatch and activated his car's siren. As the victim's car exited the freeway at a high rate of speed, the brakes locked, the car skidded through the intersection, and it made a hard right turn onto Sierra Avenue. As the car travelled down Sierra, it turned, skidded, went over a raised concrete center median, collided with a metal traffic sign, and became lodged on the median. The driver "revv[ed]" the engine, but the car did not move.

A few seconds later, the driver and front passenger doors opened. Dubose exited the driver's side of the car. Whitmore exited the passenger side of the car. Dubose ran

north, while Whitmore ran south. Officers detained defendants. Defendants were handcuffed and placed together in a patrol vehicle. Defendants smiled at one another. Whitmore appeared "almost excited or even gleeful." An officer placed a tape recorder in the patrol vehicle. The officers did not know about the incident in the group home, but defendants refused to identify themselves to the officers, so the officers placed the recorder in the car in hopes of determining why defendants fled from the officers.

The officers left defendants in the patrol car for approximately 10 minutes while the officers were at the scene of the car crash. Officer Goulding found letters with defendants' names on them in the victim's car. When defendants asked for their letters, the officer was able to identify defendants. The officer also found the victim's wallet and driver's license in the car. Officer Goulding believed the car may have been stolen, so he transported defendants to the CHP office in San Bernardino. Officer Goulding called the victim's home to ask about the car, and the victim's son said the victim was working at the group home. When Officer Goulding called the group home, he spoke to a deputy and learned about the crimes that took place there.

Officer Goulding listened to the audio recording from the patrol vehicle. On the recording, defendants discussed what crimes they could be found responsible for committing. Defendants discussed attempted murder and carjacking. Dubose asserted he would be charged with carjacking, while Whitmore would only be accused of being an accessory, since Dubose was the driver. Whitmore agreed that he would be accused of being an accessory to attempted murder and carjacking. Whitmore believed he would receive "half" the prison term of Dubose.

Dubose asked Whitmore, "Did we really get caught?" Whitmore responded, "I made that nigga sleep . . . ." As the conversation continued, Dubose said, "I was beatin' [the victim's] ass." Whitmore responded, "Oh ya, you swat that (Inaudible) . . . ." Dubose laughed, and Whitmore said, "That's my first time I ever seen anyone sleep like that." Dubose responded, "I hit him like two hits then the guy's eyes started to[] shut. The nigga's eye[s] shut." Dubose told Whitmore, "I think this gonna be the biggest charge I ever caught." Dubose believed he would be charged with "five felonies," including attempted murder and "[h]igh speed chase." Dubose told Whitmore they would be going to prison, rather than juvenile hall.

When San Bernardino County Sheriff's Deputy Scott arrived at the group home, he found the victim tied up on the floor of a bedroom closet. The victim was face down with a sheet tied around his neck. The victim was "hog-tied," with his hands behind his back and his feet tied together and pulled back toward his hands. There was a pool of blood under the victim. The victim was breathing loudly into the pool of blood. The victim did not respond to the deputy's voice or touch. The cord from a steam iron and extension cords were used to bind the victim. Deputy Scott saw a broken piece of the iron in the bedroom, "drag marks" toward the closet, and cabinets that were in disarray.

Blood spatter and stains in the entryway of the group home indicated the victim was struck at least two times while he was on his feet, but bent over or hunched down. Blood stains in Whitmore's bedroom reflected the victim was struck while on his knees or lying on the ground. The blood stains reflected "a minimum of six blows to the victim," e.g., two in the entryway and four in the bedroom.

9

At the hospital, doctors removed a blood clot that was pressing on the victim's brain. Doctors did not replace a piece of the victim's skull, which doctors had removed, because they were waiting for the brain swelling to reduce. The victim's facial bones were fractured and he had various defensive wounds. The victim suffered a fractured rib on his back side, reflecting he had been struck. The victim also suffered hemorrhages in his neck, likely due to being strangled. The victim died five days after the beating. The swelling in the victim's brain was so great that blood could not circulate to it. It was determined the victim's death was caused by "[b]lunt head injury," with strangulation possibly being a contributing factor. A forensic pathologist believed the victim's injuries could have been caused by a clothing iron or a wooden rod, if the rod were swung "very hard."

## DISCUSSION

### A.     DUBOSE

#### 1.     *TORTURE INSTRUCTION*

##### a)     Procedural History

The trial court gave the jury three different instructions for the torture special circumstances allegation. First, the court instructed the jury about the intent requirement for an accomplice. The instruction provided, "If you decide that Carlos Dubose is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstances of carjacking or robbery or torture, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life." (CALCRIM No. 703.)

10

The trial court then gave the jury a second torture instruction. The instruction provided, "[T]he People must prove that: [¶] 1. Carlos Dubose committed or aided and abetted carjacking or robbery or torture. [¶] 2. Carlos Dubose intended to commit or intended to aid and abet the perpetrator in committing carjacking or robbery or torture. [¶] 3. If Carlos Dubose did not personally commit carjacking or robbery or torture then a perpetrator, who Carolos Dubose was aiding and abetting before or during the killing personally committed carjacking or robbery or torture. [¶] 4. Carlos Dubose or Davion Whitmore did an act that caused the death of another person; [¶] AND [¶] 5. The act causing the death and the carjacking or robbery or torture were part of one continuous transaction." (CALCRIM No. 730.)

The instruction continued, "The defendant must have intended to commit, or aided and abetted the felonies of carjacking or robbery or torture before or at the time of the act causing the death. [¶] In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit carjacking or robbery or torture independent of the killing. If you find that the defendant only intended to commit murder and the commission of [the] carjacking or robbery or torture was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved." (CALCRIM No. 730.)

The third instruction informed the jury, "Carlos Dubose is charged with the special circumstance of murder involving the infliction of torture. [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. Carlos Dubose intended to kill [the victim]; [¶] 2. Carlos Dubose also intended to inflict extreme physical pain

11

and suffering on [the victim]; [¶] 3. Carlos Dubose intended to inflict such pain and suffering on [the victim] for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; [¶] AND [¶] 4. Carlos Dubose did an act involving the infliction of extreme physical pain and suffering on [the victim]." (CALCRIM No. 733.)

In regard to the third instruction, CALCRIM No. 733, the jury asked the trial court three questions: (1) "As to instruction [CALCRIM No. 733], item #1, can aiding and abetting apply?"; (2) "Must we find all 4 items on [CALCRIM No. 733] to be true in order to find special circumstance #3 in count #1 to be true? (Torture)?"; and (3) "What is the legal definition of the word (intended) in [CALCRIM No. 733] as regards to Torture?"

The trial court responded as follows: "1. Regarding the applicability of aiding and abetting as it relates to the special circumstance allegation of torture for Defendant Dubose, the answer is yes. See also Court's Instruction [CALCRIM No. 703]. [¶] 2. Yes, you must find <u>All Four</u> elements proved beyond a reasonable doubt to make a True finding on this special circumstance, and [¶] 3. Regarding the definition of 'intended,' refer to the Court's Instruction number 9 [CALCRIM No. 200] (the 3rd un-numbered paragraph)."

The jury's verdict reads, "We the jury, in the above-entitle action, find that the murder of [THE VICTIM] was committed by defendant, CARLOS DUBOSE, and that the murder was intentional and involved the infliction of Torture to be: [¶] TRUE[.]"

12

b) <u>Analysis</u>

Dubose contends the torture finding must be reversed because conflicting jury instructions permitted the jury to find the allegation true without finding Dubose possessed the requisite intent to kill. The People assert the trial court's error was harmless because (1) the trial court instructed the jury that it must find all four elements of CALCRIM No. 733 to be true, which included an intent to kill element, and (2) the jury's verdict reflects it found true the allegation that Dubose intended to murder the victim.

We apply the de novo standard when determining whether jury instructions correctly reflect the law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) Section 190.2, subdivision (a)(17) concerns special circumstances findings when a murder is committed during an enumerated felony. Robbery and carjacking are two of the enumerated felonies. (§ 190.2, subd. (a)(17)(A) & (L).) The special circumstance of torture is in a separate subdivision—it is not part of the enumerated list. (§ 190.2, subd. (a)(18).)

"[T]he torture-murder special circumstance requires proof '[t]he murder was intentional and involved the infliction of torture.'" (*People v. Pearson* (2012) 53 Cal.4th 306, 322 (*Pearson*).) The robbery and carjacking special circumstance requires only proof that that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of" one of the enumerated felonies." (§ 190.2, subd. (a)(17).)

13

Thus, as in *Pearson*, the trial court in this case "erred in including torture in the list of felonies on which the jury could base a felony-murder special circumstance under section 190.2, subdivision (a)(17)," because the intent requirement for the torture special circumstance is different than that required for the robbery and carjacking special circumstances. (*Pearson*, *supra*, 53 Cal.4th at p. 322.)

We now consider whether the trial court's error was harmless. "'If conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, [then] the instructions constitute a denial of federal due process and invoke the *Chapman*[2] "beyond a reasonable doubt" standard for assessing prejudice.' [Citation.] In contrast, 'misdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated' in *Watson*. [Citations.]" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829-830.)

In response to the jury's question, the trial court informed the jury that it had to find all four elements of CALCRIM No. 733 true, which included finding "Carlos Dubose intended to kill [the victim]." (CALCRIM No. 733.) Given the jury was directly instructed it had to find true the allegation that the murder was intentional in order to make a true finding on the torture special circumstance, we conclude the trial court's error was harmless under both the *Chapman* and *Watson* standards because the

---

2  *Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818.

14

jury was ultimately properly instructed about the requirement of Dubose intending to kill the victim.

Dubose contends the error was not harmless because (1) in the trial court's response to the jury's questions it also referred the jury back to the erroneous CALCRIM No. 703 instruction; and (2) the verdict form reflects the murder was intentional, not that the killing was intentional. Dubose's first contention is not persuasive because the trial court directly told the jury it had to find all four elements true on the correct instruction. Thus, while the reference to CALCRIM No. 703 may have caused the jury to make additional findings, it nonetheless knew it had to find the allegation that the killing was intentional to be true in order for the torture special circumstance to be true.

Dubose's second argument concerns the word "murder" being used on the verdict form, rather than the word "killing." Dubose asserts "that a finding of an intentional murder can[not] substitute for a finding of an intentional killing needed for a torture murder special circumstance finding." Dubose's argument is not persuasive because the jury was instructed it had to find, "Carlos Dubose intended to kill [the victim]." Thus, while the wording on the verdict form reflects "the murder was intentional," which could be problematic (*Pearson*, *supra*, 53 Cal.4th at p. 323, fn. 7), the error is still harmless because the jury was correctly instructed it must find "Dubose intended to kill [the victim]." (See *People v. Butler* (2009) 46 Cal.4th 847, 873 [we presume jurors are intelligent and follow the court's instructions].)

15

## 2. *UNANIMITY*

Dubose contends the trial court erred by not instructing the jury it must unanimously agree on the special circumstances findings. Specifically, Dubose asserts the jury should have been instructed that it must unanimously decide if evidence of Dubose (1) beating the victim with a wooden rod, or (2) strangling the victim with a bed sheet, proved Dubose intended to kill the victim or acted with a reckless disregard. Dubose asserts that because different factual theories (as opposed to different legal theories) of the charge were presented, a unanimous finding was required.

The California Supreme Court has held, "[T]he jury need not unanimously agree 'on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder.' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1025.) The United States Supreme Court has concluded, "'[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.' [Citation.]" (*Schad v. Arizona* (1991) 501 U.S. 624, 631-632.)

Dubose was charged with one count of murder, along with the special circumstances that the murder occurred during a robbery and carjacking, and that the killing was intentional and involved torture. The trial court instructed the jury, "In order for you to return a finding that a special circumstance is or is not true, all 12 of you must agree. [¶] You must consider each special circumstance separately."

16

Given that there was a single murder charge and the special circumstances involved separate acts, torture, taking a car, and taking a wallet, it does not appear a unanimity instruction needed to be given, since "the jury need not unanimously agree 'on the precise factual details of how a killing under one or the other theory occurred in order to convict defendant of first degree murder.' [Citation.]" (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1025.) In other words, since there was only one murder and distinct crimes composed the special circumstances allegations, there was no requirement the jury unanimously agree on the precise factual underpinnings, so long as all the jurors agreed the alleged murder and special circumstances occurred.

### 3. *MOTIVE*

Dubose contends the trial court lowered the prosecutor's burden of proof by instructing the jury the prosecutor did not need to prove a motive in the crime of "kidnapping for [purposes of committing a] robbery." Dubose contends the motive of robbery "was effectively an element" of the crime of kidnapping for purposes of robbery, so instructing the jury that a motive was not required essentially removed an element from the charged offense.

Motive and specific intent are not the same thing. "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) In *Hillhouse*, the defendant asserted the trial court erred in a murder and kidnapping for purposes of robbery case by instructing the jury that "'[m]otive is not an element of the crime charged and need not be shown.'" (*Id*. at p. 503.) The Supreme

Court explained "although malice and intent or purpose to steal were elements of the offenses, motive was not." (*Id.* at p. 504.)

Given our Supreme Court's holding that motive is not an element of kidnapping for purposes of robbery, we conclude the trial court did not err by instructing the jury that motive is not an element of the crime because the instruction correctly reflects the law. (See generally *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction"].)

### 4. *INTENT TO KILL*

Dubose contends his LWOP sentence is unconstitutional because the jury did not find Dubose intended to kill the victim. As set forth *ante*, the jury asked, "Must we find all 4 items on [CALCRIM No. 733] to be true in order to find special circumstance #3 in count #1 to be true? (Torture)?" The trial court responded, "Yes, you must find <u>All Four</u> elements proved beyond a reasonable doubt to make a True finding on this special circumstance." One of the four elements reads, "Dubose intended to kill [the victim]." Since the jury was explicitly informed that it must find an intentional killing in order to render a true finding on the torture special circumstances allegation, and that allegation was found true, we reject Dubose's premise that the jury did not find an intentional killing. As a result, we find his argument to be unpersuasive.

### 5. *CRUEL AND UNUSUAL PUNISHMENT*

Dubose asserts an LWOP sentence for a minor is cruel and unusual punishment. The United States Supreme Court has held that a mandatory LWOP sentence for a

18

juvenile violates the Eighth Amendment—it must be a discretionary sentence. (*Miller v. Alabama* (2012) ___ U.S. ___ [132 S.Ct. 2455, 2464, 2471] (*Miller*).) Section 190.5, subdivision (b), authorizes a trial court to impose an LWOP sentence or a sentence of 25 years to life when a defendant is convicted of a special circumstances murder and the defendant committed the murder when s/he was at least 16 years old, but under the age of 18 years old. Thus, the California sentencing scheme affords a trial court sentencing discretion and does not impose a mandatory LWOP sentence. As a result, we conclude Dubose's LWOP sentence does not constitute cruel and unusual punishment.

### 6. *MANDATORY SENTENCING SCHEME*

Dubose asserts it is unconstitutional to impose an LWOP sentence via a mandatory sentencing scheme that does not permit consideration of mitigating factors. As set forth *ante*, the LWOP sentencing scheme is not mandatory. Section 190.5, subdivision (b), permits a trial court to impose an LWOP sentence or a sentence of 25 years to life "at the discretion of the court." Since the sentencing statute affords a trial court discretion in sentencing a defendant, we are not persuaded that it is an unconstitutional mandatory sentencing scheme.

Dubose asserts the sentencing scheme is "'generally mandatory,'" because LWOP is the presumptive punishment and a sentence of 25 years to life is only granted in rare cases. In support of his argument, Dubose points to this court's opinion in *People v. Guinn* (1994) 28 Cal.App.4th 1130, 1142 (*Guinn*), in which we wrote, "The fact that a court might grant leniency in some cases, in recognition that some youthful special circumstance murderers might warrant more lenient treatment, does not detract

19

from the generally mandatory imposition of LWOP as the punishment for a youthful special circumstance murderer."

We do not find Dubose's argument to be persuasive, because to the extent *Guinn* held an LWOP sentence is the presumptive sentence, it has been overruled by *Miller.* In *Miller*, the United States Supreme Court set forth factors that a trial court should consider when sentencing a juvenile special circumstances murderer: mitigating circumstances and "age and age-related characteristics and the nature of their crimes." (*Miller, supra*, ___ U.S. ___ [132 S.Ct. at p. 2475].) Thus, in light of *Miller*, it would be incorrect for a court to follow the *Guinn* holding and interpret section 190.5, subdivision (b), as setting forth a presumptive LWOP sentence; rather, the subdivision must be read as requiring consideration of the *Miller* factors. (*In re Marquez* (2003) 30 Cal.4th 14, 20 [courts interpret statutes in a manner consistent with constitutional provisions].)

When section 190.5, subdivision (b), is read in light of *Miller*, rather than *Guinn*, there is not a presumptive sentencing scheme, there are merely factors to be considered. The statutory language reads, "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 or 190.25 has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

20

On its face, the statute sets forth two sentencing possibilities: (1) LWOP, or (2) 25 years to life. When the statute is read in light of *Miller*, the "discretion" aspect of the statute requires selection of one of the two sentencing options after analyzing the *Miller* factors. Thus, the statute is not unconstitutional on its face, and can be interpreted in a constitutional manner consistent with *Miller*. Accordingly, the statute is not facially unconstitutional because it does not set forth a presumptive LWOP sentence.[3]

### 7. *DISCRETION*

Dubose contends the trial court erred in sentencing him because it was unaware it had the authority to sentence him to a prison term of 25 years to life. (§ 190.5, subd. (b).) The People note the *Miller* case had not been decided at the time of Dubose's sentencing hearing and concede the matter should be remanded so the trial court may exercise its discretion concerning Dubose's sentence.

In November 2011, when the trial court sentenced Dubose, the United States Supreme Court had not yet decided the *Miller* case. Thus, the trial court did not explicitly consider the *Miller* factors when sentencing Dubose. Typically, when the

---

[3] Dubose requests this court take judicial notice of the Attorney General's respondent's brief in *Guinn, supra*, 28 Cal.App.4th 1130, because the Attorney General made arguments in that case, which would support Dubose's position concerning the presumptive LWOP sentence in section 190.5. As we have explained *ante*, *Miller* has effectively overruled the *Guinn* interpretation of section 190.5, subdivision (b). The *Guinn* interpretation of the statute would be unconstitutional in light of *Miller*. As a result, we deny the request for judicial notice because we do not need the Attorney General's *Guinn* brief to conclude Dubose is correct—*Guinn*, and its interpretation of a presumptive LWOP sentence, is problematic in light of *Miller*.

record is silent we would presume the court followed the appropriate laws (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527), but since *Miller* had not yet been decided the trial court may not have considered the factors set forth in the case. Accordingly, we will reverse Dubose's LWOP sentence for Count 1 and direct the trial court to resentence Dubose, taking into consideration the factors set forth in *Miller*. (*Miller, supra*, ___ U.S. ___ [132 S.Ct. at p. 2475] [mitigating circumstances, age, age-related characteristics, and the nature of the crimes].) We express no opinion on the issue of what sentence should be imposed.

### 8. *SENTENCING FACTORS*

Dubose asserts the trial court relied on incorrect factors in imposing his LWOP sentence. As set forth *ante*, we have reversed Dubose's LWOP sentence so that the trial court may consider the *Miller* factors when deciding whether to impose an LWOP sentence or a 25-years-to-life sentence. As a result, Dubose's contention is moot. (*People v. Travis* (2006) 139 Cal.App.4th 1271, 1280 [when no effective relief can be granted the issue is moot].)

### B. WHITMORE

### 1. *PROCEDURAL HISTORY*

During a discussion about jury instructions, the trial court asked, "What is [the] People's theory?" The prosecutor responded, "It is the felony murder rule, your Honor. That has been consistently relied upon throughout . . . the course of this trial. The appropriate instructions are indicated in 540A and 540B. This is not an intentional

22

murder. There is no evidence of that, given the state of the evidence and the witnesses that testified here."

The trial court instructed the jury with CALCRIM No. 540A, which concerns felony murder. The instruction provided, "To prove that the defendants are guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendants committed carjacking or robbery or torture. [¶] 2. The defendant intended to commit carjacking or robbery or torture. [¶] AND [¶] 3. While committing carjacking or robbery or torture defendants caused the death of another person." The instruction also provided, "It is not required that the person die immediately, as long as the cause of death and the felonies are part of one continuous transaction." (CALCRIM No. 540A.)

The trial court also instructed the jury with CALCRIM No. 549, which defines the term "continuous transaction." The instruction reminded the jurors that it was the People's burden to prove the death and the underlying felony "were part of one *continuous transaction*." (Italics added.) The instruction sets forth the rule that a continuous transaction may be found if the felony and murder occurred at the same location, if the murder was committed to aid in the commission of the felony or escape after the felony, or if the murder occurred in order to prevent the discovery or reporting of the felony.

During closing arguments, the prosecutor argued that moving the victim from the front entryway to the bedroom closet (kidnapping) made it more difficult for the victim to seek help and save himself from the attack. The prosecutor also argued the

23

kidnapping "helped [defendants] further their interest in robbing and carjacking by getting rid of him so he could not call the police on them, nor could anyone rescue him or it took a lot more time to rescue him. He is hidden, left to die with vicious injuries, hog-tied, a ligature strangling him, absolutely ridiculous the further steps that they took there. That shows you what is in the mind of these two to do those items. There is the sheet, locking him in the closet further increased his harm. He was no longer in a position to help or free himself and it facilitated the defendant[s'] ability to finish the robbery, carjacking and escape with their crimes."

In Whitmore's probation report, the probation officer asserted consecutive sentences, rather than concurrent sentences, should be imposed because (1) the crimes were independent of one another, (2) they involved separate acts of violence, and (3) they were committed at different times or in separate locations. At the sentencing hearing, Whitmore's trial attorney asserted the probation officer's three reasons were "just inane in light of the theory on which the case was tried, that of felony murder and the evidence that was presented. [¶] How can it possibly be contended that the crimes and their objectives were predominantly independent of each other when the allegation is that the homicide occurred during the commission of certain of the specified felonies, and when one of the acts was committed for the purpose of one of the other crimes[?]"

In response, the prosecutor argued, "[T]his beating took place for at least 30 to 40 minutes, and prior to that there was planning involved, that it occurred on separate times and separate dates in regards here. You've got separate acts, I think, when you're talking about both robbery and the carjacking, because there's separate items and

24

separate behaviors and separate acts that are taking place with respect to completing each of those different crimes.  Certainly with respect to the kidnapping as well when you have the movement, you have the placement, and you have the various acts taking place in that regard.  In regard to the torture, subsequently taking place after the kidnapping portion, so that may be the way in which these three items are applied to this factual scenario independently and separately from what defense counsel has indicated."

The trial court said, "Court does find, based upon the facts presented in trial, the crimes were committed at different times and were separate and independent acts, even though they fall under the umbrella and charges of felony murder, they were still separate and independent acts and independent events of violence."  The court (1) imposed a term of 25 years to life for the murder conviction; (2) imposed a consecutive one year, eight month term for the carjacking conviction; (3) stayed the robbery sentence pursuant to section 654; and (4) imposed a consecutive life term for the conviction of kidnapping to commit robbery.

2.      *ANALYSIS*

Whitmore contends the trial court erred by not applying section 654 to his sentences for carjacking (§ 215, subd. (a)) and kidnapping for purposes of robbery (§ 209, subd. (b)(1)) because the two crimes were bundled into an indivisible course of conduct with the felony murder and shared a single common objective.

"'Section 654 precludes multiple punishment for a single act or indivisible course of conduct punishable under more than one criminal statute.  Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning

25

of section 654 depends on the "intent and objective" of the actor. [Citation.] If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.]' [Citation.]" (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.)

First degree felony murder occurs when a killing "is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or [various sexual offenses] . . . ." (§ 189.) "For felony murder, the required mental state is the specific intent to commit the underlying felony. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 175.) Typically, a section 654 issue is reviewed for substantial evidence. (*People v. Hairston*, *supra*, 174 Cal.App.4th at p. 240.)

The jury was instructed the murder and underlying felony must be "part of one continuous transaction." At sentencing, the trial court contradicted the jury's finding to the extent the court found separate acts in regard to the murder and underlying felony. A trial court cannot contradict a jury's findings when conducting a section 654 analysis. (*People v. Siko* (1988) 45 Cal.3d 820, 825-826.) Thus, the underlying felony and felony murder are part of a continuous transaction.

The problem we face in this case is: it is unclear from the record what crime constitutes the underlying felony because the jury was given the option of relying on carjacking, robbery, and/or torture for the underlying felony. Unanimity instructions are not required for a jury finding on the underlying felony in a felony murder charge. (*People v. Lewis* (2001) 25 Cal.4th 610, 654.) Therefore, it is possible some jurors found carjacking to be the underlying felony, while others found robbery to be the underlying felony.

It is difficult to determine what other crimes (as opposed to the underlying felony) were separate from, or continuous with, the felony murder when we do not know what crime underlies the murder. For example, we do not know if the felony murder is murder-robbery or murder-carjacking, so it is difficult to analyze whether the kidnapping for purposes of robbery is a separate act without speculating about the different possibilities. We also cannot determine Whitmore's intent during the murder, since the intent during the murder is the intent to commit the underlying felony. (*People v. Booker*, *supra*, 51 Cal.4th at p. 175.)

Whitmore asserts the trial court found the underlying felony is robbery because the trial court stayed the robbery sentence pursuant to section 654. Our Supreme Court appears to have concluded section 654 prohibits imposition of a sentence for both the underlying felony and the felony murder. (See *People v. Holt* (1997) 15 Cal.4th 619, 692; see also *People v. Osband* (1996) 13 Cal.4th 622, 730-731.) Thus, there is a legal support for Whitmore inferring robbery is the underlying felony.

27

However, in regard to the kidnapping for purposes of robbery, the intent for that offense is robbery. (*People v. Lewis* (2008) 43 Cal.4th 415, 519 [a defendant must have the specific intent to commit robbery when the kidnapping begins]; see also *People v. Jones* (1997) 58 Cal.App.4th 693, 717 [Fourth Dist., Div. Two].) Therefore, it is also possible the trial court stayed the robbery sentence pursuant to section 654 because robbery shares the same intent and course of conduct with the kidnapping for purposes of robbery—not because robbery is the underlying crime for the murder. Accordingly, it is unclear if the trial court found robbery is the underlying felony for the felony murder because there is an alternate reason for the trial court staying the robbery sentence.

The People assert the trial court impliedly found the underlying felony to be torture based upon the trial court imposing sentence on the carjacking and kidnapping. We infer the People are asserting the underlying felony had to be torture, because if the underlying felony is robbery then the kidnapping sentence would have also been stayed. For example, if the felony murder is murder-robbery, then the intent for the murder was robbery, and therefore the kidnapping for purposes of robbery shares the same robbery intent and likely should have been stayed if it was part of the same course of conduct. Accordingly, under the People's theory, the felony murder is murder-torture, and the robbery was stayed pursuant to section 654 only because it shared the same intent and course of conduct with the kidnapping for robbery. (*People v. Jones*, *supra*, 58 Cal.App.4th at p. 717.)

28

In sum, the trial court stayed the robbery sentence pursuant to section 654, but it is unclear if that stay relates to the felony murder or the kidnapping for purposes of robbery. Therefore, we do not know what felony constitutes the underlying felony for the felony murder. The jury was given the options of resting the first degree murder finding on a theory of "carjacking or robbery or torture." Based upon this record, it is possible no one has yet determined the precise underlying felony. If we do not know the exact underlying felony, then we cannot perform a section 654 analysis, because we need to know the underlying felony in order to decipher Whitmore's intent when committing the felony murder. (*People v. Booker*, *supra*, 51 Cal.4th at p. 175 ["For felony murder, the required mental state is the specific intent to commit the underlying felony"].)

The question that confronts us is: who determines the underlying felony in a felony murder when the jury was given three options for the underlying felony? Supreme Court law provides unanimity instructions are not required for a jury finding on the underlying felony in a felony murder charge. (*People v. Lewis*, *supra*, 25 Cal.4th at p. 654.) Accordingly, we cannot conclude the finding must be made by a jury, because the jury is not required to unanimously select a single underlying felony. (See *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County*, *supra*, 57 Cal.2d at p. 455 [intermediate appellate courts must follow Supreme Court law].)

Accordingly, we must consider whether the trial court has the authority to select the underlying felony for the felony murder when it relates to conducting a section 654 analysis. We conclude the trial court does have this authority.

In *People v. McCoy* (2012) 208 Cal.App.4th 1333 (*McCoy*), the defendant was convicted of burglary, violating a restraining order, and other crimes when he went to the victim's residence, broke in, and sexually assaulted her. (*Id.* at pp. 1335-1336.) The defendant contended that, because of the way the offenses were charged, there was no jury finding that the violation of the restraining order occurred on a separate occasion from the other crimes. (*Id.* at p. 1338.) The trial court imposed punishment for the violation of the restraining order, as well as for the other crimes, despite section 654; the evidence suggested the defendant may have made more than one entry into the victim's residence, and either entry would support a conviction of violating the restraining order. (*Id.* at pp. 1337-1338.) The defendant objected that, because there was no jury finding for which entry was the basis for the conviction of violating a protective order (or, indeed, whether there had actually been more than one entry), the trial court could not make an independent finding that there was a separate entry upon which to base separate punishment—i.e., that section 654 did not apply. (*Id.* at p. 1338.)

The *McCoy* court held that a trial court in its sentencing discretion may base its decision on any facts that are in evidence at trial, without regard to the verdicts, unless some circumstance in those verdicts forecloses the trial court from doing so. (*McCoy*, *supra*, 208 Cal.App.4th at p. 1340.) For example, in *People v. Siko*, *supra*, 45 Cal.3d 820, both the charging document and the verdicts had specified two particular sex offenses as the basis for generic charges of lewd and lascivious conduct. Neither the closing argument nor the instructions had suggested any other basis for the molestation counts. (*Id*. at p. 826.) Accordingly, the prosecution, at sentencing, could not posit an

30

alternative factual basis (based upon the evidence at trial) for the two generic molestation convictions. (*Id.* at p. 825.) The prosecution had to stay with the two specific sex acts for which the jury had also convicted the defendant, and therefore section 654 precluded punishment for the generic offenses. (*Id.* at pp. 825-826.) "*Siko* is thus authority that where there is a basis for identifying the specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654." (*McCoy*, at p. 1339.)

The *McCoy* court analyzed various cases in concluding where there is not a basis for identifying the specific findings within a verdict, then the trial court is not foreclosed from considering all the available evidence in making its decision under section 654. For example, "The defendant in *People v. Centers* (1999) 73 Cal.App.4th 84 entered a house with a gun. Three people were inside. He kidnapped one of them. The jury convicted him inter alia of kidnapping, and of a single count of burglary with a firearm use enhancement. [Citation.] [The appellate court in *Centers*] noted that neither the information nor the verdicts specified a particular victim of the burglary and its firearm use enhancement. [Citation.] In that circumstance, 'the trial court is entitled to make any necessary factual findings *not already made by the jury*' [citation] and thus 'could properly find multiple victims' (a finding for which there was substantial evidence) and impose punishment for the burglary and enhancement in connection with one of the occupants of the apartment as well as the kidnapping of the other [citation]." (*McCoy*, *supra*, 208 Cal.App.4th at pp. 1339-1340.)

Accordingly, we must consider whether there was anything in the manner in which the case was charged and tried, or the jury instruction, or in the arguments of counsel, which would foreclose the trial court from considering all the evidence at trial in making a sentencing decision under section 654, i.e., selecting the underlying felony. The jury instruction limited the trial court to selecting carjacking, robbery, or torture as the underlying felony. Arguably, the charging document limited the trial court to selecting carjacking or robbery as the underlying felony, because Whitmore was not charged with torture. (§§ 190.2, subd. (a)(18), 206.) Since Whitmore was not charged with torture, it may be problematic to select torture as the underlying felony because arguably Whitmore was not given notice that he needed to defend against a torture allegation. (Compare *People v. Mancebo* (2002) 27 Cal.4th 735, 747 [due process requires fair notice] with *People v. Cleveland* (2001) 87 Cal.App.4th 263, 269-271 [right to a jury does not apply to statutes that mitigate punishment, such as section 654].)

We are left with the need for the trial court to explicitly, on the record, select the underlying felony within the limitations set forth *ante*. The trial court then needs to decide the applicability of section 654. We are not concerned with *Apprendi*[4] issues regarding the trial court's findings, because section 654 concerns lessening Whitmore's sentence, not raising it. (*People v. Cleveland*, *supra*, 87 Cal.App.4th at pp. 269-271.)

---

[4] *Apprendi v. New Jersey* (2000) 530 U.S. 466.

32

The People assert the matter does not need to be returned to the trial court, because this court should simply apply the substantial evidence test to the trial court's implied finding that torture is the underlying felony for the felony murder. We address the People's assertion that the trial court impliedly found torture to be the underlying felony. As explained *ante*, the record is unclear that the trial court impliedly found torture to be the underlying felony since the record can also be interpreted as reflecting the trial court (1) found robbery to be the underlying felony, or (2) did not select an underlying felony.

At oral argument in this court, the People asserted torture could be selected as the underlying felony, without offending principles of due process, because enough argument and evidence were presented regarding Whitmore and torture during trial and the pretrial proceedings that Whitmore had sufficient notice he needed to defend against torture allegations. The People rely on *People v. Houston* (2012) 54 Cal.4th 1186, 1227 through 1229, to support their argument.

In *Houston*, the Supreme Court concluded a defendant who was charged with attempted murder, but not charged with willful, deliberate, and premeditated attempted murder, forfeited his argument concerning being improperly sentenced for willful, deliberate, and premeditated attempted murder. (*Houston*, *supra*, 54 Cal.4th at pp. 1225-1228.) The Supreme Court concluded the defendant had notice of the charges because (1) the trial court said during trial the defendant could face life imprisonment, and (2) the trial court said the verdict form and jury instructions would include information about deliberate and premeditated attempted murder as a special finding.

(*Id*. at p. 1227). The Supreme Court concluded the defendant should have raised an objection to the insufficient indictment, in order to preserve the issue for appellate review. (*Id.* at p. 1228.)

In this case, we do not know what crime the trial court will select as the underlying felony. We will not issue an advisory opinion deciding the possible due process implications, if any, that might arise from the trial court's decision if it were to select torture as the underlying felony. At this point, the People's argument that there are no due process conflicts with selecting torture as the underlying felony would be better addressed to the trial court; the issue is not ripe for a decision by this court. (*People v. Johnson* (2006) 142 Cal.App.4th 776, 789, fn. 4.)

Whitmore asserts that it would be "improper for this Court to return the case to the trial court for a determination of the specific underlying felony," because the Supreme Court has concluded a unanimity instruction is not required for determining the underlying felony in a felony murder. (*People v. Lewis*, *supra*, 25 Cal.4th at p. 654.) Contrary to Whitmore's position, it is precisely because a unanimity instruction is not required that the matter must be returned to the trial court. As explained *ante*, since the jury is not required to unanimously select the underlying felony, then the duty falls to the trial court for purposes of the section 654 analysis. (*McCoy*, *supra*, 208 Cal. App.4th at p. 1340.)

## DISPOSITION

Dubose's life without parole sentence is reversed (Count 1), so the trial court may exercise its discretion. The trial court is directed to resentence Dubose on Count 1,

taking into consideration the factors set forth in *Miller*.  (*Miller*, *supra*, ___ U.S. ___ [132 S.Ct. at p. 2475] [mitigating circumstances, age, age-related characteristics, and the nature of the crimes].)  In all other respects Dubose's judgment is affirmed.

Whitmore's sentences on all four counts are reversed.  The trial court is directed to resentence Whitmore on all four counts and determine the underlying felony for the felony murder for purposes of conducting a section 654 analysis.  In all other respects Whitmore's judgment is affirmed.

CERTIFIED FOR PUBLICATION


MILLER
            J.


We concur:


RICHLI
      Acting P. J.


KING
         J.

35