[No. C057504. Third Dist. May 26, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY JEROME HAIRSTON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, III, IV, VII and VIII.

## COUNSEL

William I. Parks, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Judy Kaida, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NICHOLSON, J.**—A jury convicted defendant Anthony Jerome Hairston of three misdemeanor counts of resisting arrest (Pen. Code, § 148, subd. (a)(1)),[1] but it deadlocked on one felony count of making a criminal threat (§ 422). On retrial, a second jury convicted defendant of one count of criminal threat. (§ 422.) It also determined that defendant personally used a handgun in making the threat (§ 12022.5, subd. (a)), but it found not true an allegation that defendant committed the crime for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

The trial court sentenced defendant to a prison term totaling 13 years, based on the upper term of three years on the criminal threat count, plus the upper term of 10 years for the personal handgun use enhancement. The court also sentenced defendant to concurrent one-year terms in the county jail for the three resisting arrest counts.

Defendant appeals, raising the following contentions:

1. Insufficient evidence supports the criminal threat conviction;

2. The trial court erred in failing to instruct sua sponte on the lesser included offense of attempted criminal threat;

3. The court erred by not bifurcating trial on the gang enhancement;

---

[1] All subsequent undesignated references to sections are to the Penal Code.

4. The court improperly instructed the jury on the concept of reasonable doubt by using CALCRIM Nos. 220 and 222;

5. The jury erred in convicting defendant of three separate counts of resisting arrest instead of one count, and defendant suffered ineffective assistance of counsel when trial counsel failed to make a motion to dismiss two of the counts;

6. The court violated section 654 by imposing separate jail terms on the resisting arrest counts;

7. The court erred by imposing the upper term sentence on the gun use enhancement without stating its reasons for doing so, and defendant suffered ineffective assistance of counsel when his trial counsel failed to object on this ground; and

8. The trial court committed *Cunningham*[2] error when it imposed the upper term sentence on the criminal threat count.

We affirm the judgment in all respects.

## FACTS

Braulio Meraz lived in an Oak Park apartment complex with his wife and four children. On February 20, 2007, Meraz was outside in the complex's parking lot talking with a friend who was working on a car. Patrice Watson was also there.

A maroon, four-door sedan pulled into the parking lot, with rap music blaring from inside. Three people exited the car. Defendant, the car's driver, was rapping and singing.[3] Meraz told his friend that defendant's singing sounded like a song Elmo from Sesame Street had rapped.

Defendant heard Meraz's remark. He asked Meraz if he was trying to be funny. Surprised, Meraz stood back and went about his business. He also replied angrily and called defendant "boy." Watson testified that defendant told Meraz to watch his "M F" mouth, and then words went back and forth.

Defendant and his companions walked up a flight of stairs and into an apartment. Watson stated that before defendant went inside, he broke the window of one of the apartments. Meraz did not see that act or hear any glass breaking.

---

[2] *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856].

[3] Meraz and Watson both identified defendant at trial as the driver of the car.

A man nicknamed "Pumpkin" came out of the upstairs apartment and asked Meraz if the three men had been "tripping" with him. Pumpkin said he would handle it. Meraz, thinking the incident amounted to nothing, did not respond, and he went back to talking with his friends.

Eventually, defendant and his two companions came out from the apartment. Watson testified that defendant stood at the railing, telling Meraz he did not know whom he was messing with. Defendant said he ran Oak Park. As defendant walked down the stairs, he told Meraz, "I've got something for you." Defendant and Meraz renewed their verbal confrontation. Meraz told defendant he was not scared. At the bottom of the stairs, defendant told Watson to tell Meraz he had better respect him.

Meraz testified that he did not hear, or could not recall, any of these statements by defendant. He claimed he did not exchange any words with defendant while defendant was coming down the stairs. He did, however, watch defendant come down the stairs, and he gave defendant "hard looks" while he walked back to his car. His fists may even have been clenched. Meraz was prepared to fight.

Defendant and his companions got back into their car. Meraz walked up to the car in an aggressive manner. When he put his hands on the passenger door and looked in, he saw defendant seated in the driver's seat holding a handgun up to his chest. The gun was pointed away from Meraz. Defendant repeatedly asked Meraz, "[I]s there a problem, bitch? Is there a problem bitch? Is there a fucking problem, bitch?" Defendant put his left hand down to the side, pulled out another gun, and handed it to his front seat passenger. The passenger in the backseat leaned forward and also displayed a gun.

Meraz suddenly felt his life was in danger. He threw up his hands, backed away from the car, and told defendant he did not want any trouble "like that." Meraz backed away as far has he could to a fence. As defendant backed the car up to leave, he and his passengers continued calling Meraz a "bitch" and asking if there was "a fucking problem." Meraz believed they were doing anything they could to get him to respond. Afraid of being shot, Meraz said nothing. He "sort of blacked out to what they were saying" at that time. However, as the car drove away, Meraz heard someone from inside the car say, "[Y]ou better not be here when we get back."

Watson testified she saw defendant point his gun at Meraz as he started to back the car out. At that point, Watson moved away from Meraz. One of the passengers in the car said to her, "[Y]eah, mom, go in the house." Believing the three men "were about to light [Meraz] up," Watson went into her apartment. She told her daughter and niece to take her grandchild into the room and lie down on the floor.

Meraz was able to remember the car's license plate. He ran to his apartment and called 9-1-1. He feared for his life and that of his family, and he believed the men would return to harm them. He told the operator the three men were going to come back because that was what they had said, and he wanted the police to get to the complex quickly in case the men returned.

Approximately 15 minutes after receiving the dispatch based on Meraz's call, Sacramento County Sheriff's Deputy Donny Vettel noticed he was driving behind defendant's car. Defendant pulled into an apartment complex and parked the car. Deputy Vettel activated his lights. Defendant and the rear seat passenger got out of the car and ran. The deputy yelled at the men to stop, but they ran around a building and out of sight. Deputy Vettel did not pursue them. No one remained in defendant's car.

As Sheriff's Deputy Robert Patton drove past the apartment complex, he saw defendant and another person running through the complex and jumping over a wall surrounding a garbage dumpster. Deputy Patton exited his car, identified himself, and ordered the two men to put their hands over their heads. Defendant and his companion looked at the deputy, jumped back over the wall, and ran through the complex. Deputy Patton ran after them, but when the two men ran in separate directions, the deputy stopped his pursuit.

Sheriff's Deputy Robert White arrived at the complex to assist Deputy Vettel. As Deputy White was driving around the complex, defendant ran towards Deputy White's car. Defendant's right hand was in his pants. Deputy White slammed on his brakes, got out of his car, pointed his gun at defendant, and commanded defendant to stop. Defendant turned, ran away through a parking lot, and ran behind a concrete retaining wall and out of the deputy's sight.

Seconds later, defendant ran around the retaining wall and jumped over a fence into a park. Both of defendant's hands were now visible. Deputy White jumped onto the fence, pointed his gun at defendant, and told him to lie down and give up. Defendant did.

Deputy White searched the area. Behind the retaining wall, he found a black wool jacket and a sock containing a .38-caliber handgun. There were five expended shell casings in the gun but no live ammunition.

Sacramento County Sheriff's Department Detective John Sydow testified that defendant was a validated member of the Oak Park Bloods criminal street gang. A tattoo on the back of defendant's hand indicated he was affiliated with the 33rd Street subset of the Oak Park Bloods.

Detective Sydow related two examples of the Oak Park Bloods' primary activities, neither of which involved defendant. In the first incident, a gang

member was exchanging words with a man from a rival gang in 2005. The other man stated he was from Oak Park and asked the Bloods member why he had not seen him around Oak Park. Believing he had been "disrespected," the Bloods member responded by shooting the man five times. The man survived.

The second incident occurred in April 2004. A Bloods member attempted to steal a car and yelled at the Russian driver to get out of the car. When the Russian man refused to get out, the Bloods member shot him in the chest. The man ultimately died from the shooting.

Detective Sydow stated the apartment complex where Meraz and Watson lived was generally controlled by the Oak Park Bloods and specifically by the Ridezilla subset of the Oak Park Bloods for the sale of narcotics.[4] Ridezilla and Oak Park Bloods gang members would intimidate the residents and neighbors to prevent them from reporting the gang's drug sales to the police. The police received many calls from residents, but when officers responded, the complaining residents could not be found or would deny placing the call.

Detective Sydow opined that in a hypothetical situation based on the facts of this case, the criminal threats were done for the benefit of the Oak Park Bloods. If a citizen of the apartment complex were to stand up to a Bloods member, others would watch to see whether the gang member would respond. In the deputy's opinion, the gang member could not let the confrontation pass without responding. In order to earn respect for himself and his gang, the member would do whatever was necessary to intimidate the citizen. Without earning this type of respect, the gang would be unable to accomplish its crimes.

## DISCUSSION

## I–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[4] Detective Sydow testified that in his experience, it was very common for members of different gang subsets to intermingle and hang out together due to their common gang membership. For instance, a member of the 33rd Street Bloods would hang out with members of Ridezilla because they were friends and had a common gang affiliation with the Oak Park Bloods.

\* See footnote, *ante*, page 231.

## V

### Multiple Convictions of Violating Section 148

Defendant claims error occurred when he was convicted of three separate misdemeanor counts of resisting a peace officer in the discharge of his duty. (§ 148, subd. (a).) He asserts that because the multiple counts arose from a single, nonviolent act, he can be convicted at most of only one count. Alternatively, he claims he suffered ineffective assistance of counsel because his trial counsel did not move to dismiss two of the counts. We disagree with both of his arguments. Defendant can be convicted for each peace officer he resisted.

■ Unless the Legislature says otherwise, if a defendant commits a single criminal act that affects multiple victims, he can be convicted of multiple counts of violating the same statute only if the gravamen of the offense "is centrally an 'act of violence against the person.' " (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 351 [211 Cal.Rptr. 742, 696 P.2d 134], quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 20 [9 Cal.Rptr. 607, 357 P.2d 839].)

Regarding section 148, the Legislature has said otherwise. It has treated violations of section 148 similar to how the courts treat a violent criminal act that affects multiple victims. A defendant can be convicted under section 148 for each peace officer he obstructs, even if he engages in only one act of obstruction. This rule is found in subdivision (e) of section 148. The statute reads, in pertinent part: "A person may be convicted of multiple violations of this section [section 148] if more than one public officer, peace officer, or emergency medical technician are victims." (§ 148, subd. (e).) (Neither party cited this subdivision to us.)

The Legislature could not have been clearer. If, in the course of resisting an officer, a defendant resists another officer, he is guilty of committing a second separate offense and may be convicted separately for that offense.

The facts of this case highlight why section 148, subdivision (e), is good policy. The pursuing deputies attempted to apprehend defendant while knowing he might have been armed, and one of the deputies drew his weapon to make the arrest. Defendant put himself, the deputies, and the public at risk of harm each time, and in each place, he refused to obey the deputies. His conduct in this case makes him more culpable than a person who resists arrest by only one officer in one location.

Defendant relies on *People v. Garcia* (2003) 107 Cal.App.4th 1159 [132 Cal.Rptr.2d 694] (*Garcia*) to assert he is subject to only one conviction, but

that case is distinguishable. There, the defendant was convicted of three counts of felony evading a peace officer (Veh. Code, § 2800.2, subd. (a)). (*Garcia, supra*, at pp. 1161–1162.) The Court of Appeal reversed two of the counts. Although the pursuit had involved multiple peace officers in multiple vehicles, "the evading was an uninterrupted single course of conduct, i.e., one continuous act of driving lasting 30 minutes. The statutory language . . . contemplates a continuous course of driving, which may transpire over a short or long period of time." (*Id.* at p. 1163.)

Here, even if defendant's acts of resisting arrest were one continuous act, the statutory language is different. Unlike the statute at issue in *Garcia*, section 148 expressly states a defendant can be convicted for each officer whose exercise of duty he resists. *Garcia* does not apply to this case.[5]

██ The evidence shows defendant resisted arrest by three different peace officers. Under the express language of section 148, defendant could be convicted for each officer whose exercise of duty he resisted. Thus, there was no error, and defense counsel did not render ineffective assistance by not moving to dismiss two of the counts.

## VI

### *Multiple Punishments on Section 148 Counts*

We turn from the issue of multiple convictions to the issue of multiple punishments. Defendant claims the trial court violated section 654 when it imposed concurrent one-year jail terms for each violation of section 148. He argues section 654 required the court to stay imposition of sentence on two of the misdemeanor counts because the three convictions were based on a single course of conduct and the acts of resisting were incident to one objective. We disagree.

Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential

---

[5] We are aware the federal Ninth Circuit Court of Appeals has stated that "under California law, persons who violate § 148(a)(1) in a number of respects in the course of a single incident may be charged and convicted only once." (*Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 699, fn. 5 (*Smith*).) We refuse to give the *Smith* court's statement any weight to the extent the statement can be interpreted to limit the number of section 148 convictions to one, no matter how many officers are victims. The *Smith* court made no mention of the Legislature's contrary directive in section 148, subdivision (e), perhaps because the defendant in that case pleaded guilty to only one count of violating section 148, even though he violated the statute numerous times against at least two peace officers. (*Smith, supra*, at pp. 693–694, 696–697.)

term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

■ Case law has expanded the meaning of section 654 to apply to more than one criminal act when there is a course of conduct that violates more than one statute but nevertheless constitutes an indivisible transaction. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211 [23 Cal.Rptr.2d 144, 858 P.2d 611].) "Section 654 precludes multiple punishment for a single act or indivisible course of conduct punishable under more than one criminal statute. Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor. (*Neal v. State of California*[, *supra*,] 55 Cal.2d [at p. 19].) If all of the offenses are incident to one objective, the court may punish the defendant for any one of the offenses, but not more than one. (*People v. Perez* (1979) 23 Cal.3d 545, 551 [153 Cal.Rptr. 40, 591 P.2d 63].) If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct. (*People v. Beamon* (1973) 8 Cal.3d 625, 639 [105 Cal.Rptr. 681, 504 P.2d 905].)" (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267–268 [104 Cal.Rptr.2d 641].)

"The determination of whether there was more than one objective is a factual determination, which will not be reversed on appeal unless unsupported by the evidence presented at trial. [Citation.] The factual finding that there was more than one objective must be supported by substantial evidence. [Citation.]" (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438 [5 Cal.Rptr.2d 648].)

Defendant claims the facts at best support a finding that he violated section 148 with one and the same objective—to avoid arrest by the officers. The Attorney General argues the evidence supports the trial court's implicit determination that defendant violated section 148 three times with an independent criminal objective for each violation—to avoid arrest by each particular officer.

We agree with the Attorney General. Defendant formed a new and independent intent with each officer he encountered. Moreover, each encounter between an armed peace officer and an armed, fleeing felon carried with it the potential for death or great bodily injury for the officer, for defendant, and for differing sets of residents of the apartment complex where the three encounters occurred. We conclude on the facts of this case that substantial evidence supports the trial court's implicit determination that defendant had a separate objective for each violation of section 148.

VII, VIII[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Robie, J., concurred.

A petition for a rehearing was denied June 11, 2009, and appellant's petition for review by the Supreme Court was denied September 17, 2009, S174430.

[*]See footnote, *ante*, page 231.