Filed 6/6/14  P. v. Velasco CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B246755 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA390340) |
| v. | |
| JOSHUA VELASCO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. John S. Fisher, Judge.  Affirmed.

Murray A. Rosenberg, under appointment by the Court of Appeal, for Defendant and Appellant Joshua Velasco.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Adan Diaz.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants and appellants Adan Diaz and Joshua Velasco were jointly tried on charges of robbery, attempted robbery and attempted murder.[1]  On appeal from his conviction of one robbery count, Velasco contends the verdict was not supported by substantial evidence.  On appeal from his conviction on all four counts, Diaz contends: (1) the verdicts on the attempted robbery and attempted murder counts were not supported by substantial evidence and (2) sentence for attempted robbery should be stayed pursuant to Penal Code section 654.[2]  We affirm.

## FACTUAL BACKGROUND

A.    *Manuel Aldana Robbery (Count 4)*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established that at a little before 4:30 p.m. on October 12, 2011, high school student Manuel Aldana got off a public bus at the stop on Valley Boulevard, in front of California State University Los Angeles (Cal. State Los Angeles).  As he walked east on Valley Boulevard towards home, Aldana was texting and listening to music on his cell phone.  Aldana had walked for about 10 minutes when he

---

[1]    Diaz and Velasco were jointly charged by amended information with two counts of robbery (counts 1 and 4), attempted robbery (count 3) and attempted murder (count 2); criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C)) and gun use enhancements (§ 12022.53, subd. (b), (c), (d), (e)) were also alleged.  The gang enhancements and section 12022.53, subdivision (e) gun use enhancement were later dismissed as to both defendants.

Velasco was convicted on count 1, but acquitted on the remaining three counts. He was sentenced to a three-year midterm and timely appealed.

Diaz was convicted on all four counts and the jury found true the remaining gun use enhancements.  He was sentenced to nine years for attempted murder (count 2) plus 25 years to life for a section 12022.53, subdivision (d) gun use enhancement; sentence for section 12022.53, subdivision (b) and (c) gun use enhancements was stayed pursuant to section 654; concurrent sentences were imposed on counts 1 (five years), 3 (three years) and 4 (three years). Diaz timely appealed.

[2]    All future undesignated statutory references are to the Penal Code.

2

noticed a man wearing a white muscle shirt walking down the Bullard Street hill towards Valley Boulevard and a woman, later identified as Pamela Estella, walking in the middle of the street. Aldana described the man as in his early 20's, about 5 feet 6 inches tall, with short hair, a goatee, a pinkish skin tone, a three- to four-inch scar on his right cheek and maybe some pimples. After Aldana had walked past Bullard Street, the man in the white muscle shirt came up from behind Aldana and demanded Aldana give the man his phone. Aldana just kept walking and texting. But when the man shouted at Aldana to give him the phone, Aldana looked up and saw that the man was pointing a small black gun at him. After Aldana handed over his phone, the man ran to a beige Honda parked about 35 feet away and got into the front passenger seat. Aldana saw a chubby bald man sitting in the driver's seat of the Honda, ducking down as if he was trying to hide his face. Estella got into the back seat of the Honda, which drove away.[3] Aldana borrowed a cell phone to call 911.

On October 17, 2011, Aldana was shown several photographic lineups (six-packs) by police. On one six-pack, Aldana circled Velasco (the gunman) in position number three, as well as an unidentified person in position number four, and wrote: "The suspect in my case is in position number three and four. Three and four look like the guy. Three looks like the guy because his facial hair and short hair. Four looks like the guy because his eye shape and his ear area." Aldana did not identify Diaz (the driver) or Estella, who were each included in separate six-packs. At the preliminary hearing, Aldana testified that Velasco looked familiar and he may have seen Velasco around Cal. State Los Angeles about a week before the robbery, but Aldana did not see Velasco on the day he was robbed. At trial, Aldana testified that the person pictured in position number three whom he circled on the six-pack (Velasco), looked more like his assailant than the person in position four, but he could not identify Velasco as his assailant. Aldana testified that Diaz was neither the man who robbed him nor the man sitting in the parked Honda.

---

**3**      Estella had been jointly charged in the original information with the Garcia robbery, but was not named in the operative amended information. She is not a party to this appeal.

Aldana described the woman he saw getting into the Honda as short, 25 to 30 years old with several tattoos on her back. Although he had not identified Estella from the six-pack, at trial Aldana identified her from a photograph of her tattoos.

Diaz was convicted of this robbery but Velasco was found not guilty.

B. *Alexander Tolentino Attempted Murder and Attempted Robbery (Counts 2 and 3)*

About 15 minutes after Aldana was robbed at gunpoint on his way home from the Valley Boulevard bus stop, Alexander Tolentino was waiting alone at the same bus stop. Tolentino was listening to music on his iPod when a man holding a gun (identified as Diaz by other eye witnesses) ran up and demanded Tolentino hand over his iPod. Thinking it was some sort of prank, Tolentino refused. Diaz shot Tolentino in the chest, then ran away. As he was running, Diaz turned around and shot Tolentino twice more. Tolentino saw the shooter get into the passenger seat of a "brownish," older model sedan parked about a block away, which drove away. Tolentino called 911. A bystander (J.L.) waited with Tolentino for police and paramedics to arrive. Tolentino was unable to identify his assailant from six-packs, at the preliminary hearing or at trial.

J.L. testified that she was parked in a strip mall on Valley Boulevard when she heard three gun shots. Looking towards the sound, J.L saw Tolentino standing near a fence. She also saw Diaz and Estella running to a parked gold or beige four-door car. Diaz was holding a gun. Just as Diaz and Estella reached the parked car, J.L. drove away because her young niece was with her and she was afraid there would be more shooting. After driving a few blocks, J.L. reconsidered and drove back to see if someone needed help. She waited at the scene with Tolentino for help to arrive. From six-packs shown to her five days later, J.L. identified Diaz as the man with the gun she saw running to the parked car and Estella as the woman she saw running to the same car.

When witness J.R. heard three gunshots, he walked outside of a business nearby and saw Tolentino at the bus stop, holding his chest. J.R. also saw a man getting into the rear passenger seat of a gold four-door car, possibly a late model Impala, parked about 50 feet away. J.R. watched as this car drove onto the southbound 710 freeway. Five days

4

later, J.R. identified Diaz as the person he saw running to the car from a six-pack. At trial, J.R. testified that neither Diaz nor Velasco looked familiar to him. The man J.R. saw getting into the car had lighter skin than Diaz.

Diaz was convicted of both counts. Velasco was found not guilty.

C.      *Guadalupe Garcia Robbery (Count 1)*

Guadalupe Garcia owns Pe-Cas, a sports clothing store on Huntington Drive. Walking distance from Pe-Cas, is a Food 4 Less grocery store. A video recording taken by surveillance cameras at that Food 4 Less at about 3:30 p.m. on October 14, 2011, was played for the jury. The video recording shows Estella, Diaz and Velasco arriving at the Food 4 Less in a small, white four-door car. Diaz is wearing a two-tone blue Dodgers cap; Velasco is wearing a black T-shirt. They enter the store together, purchase some black trash bags and then leave.

J.C. owns the store next to Pe-Cas. At about 4:30 p.m. that same day, J.C. noticed a woman trying to back a small white car into an angled parking space on the street; there were two men in the car. A short while later, J.C. saw two men running from Pe-Cas towards the parked white car; their faces were covered and they were carrying a black plastic bag. J.C. described one of the men as 5 feet 11 inches tall and the other as six feet tall.

Garcia testified that she was alone at Pe-Cas late that afternoon when a woman, later identified as Estella, came in asking about children's clothes, then left without buying anything. Moments later, two young men wearing bandanas on the lower half of their faces and baseball caps pulled down over their eyes entered the store "using a lot of force." One of the men was wearing a royal blue Dodgers windbreaker and the other was wearing a black sweater. The manner in which the man in the Dodgers jacket kept his hands in the pocket, and the fact that Garcia saw something protruding from the pocket, made Garcia believe he was holding a gun. The men told Garcia not to look at their faces, then pushed her to the back of the store and onto a chair in the dressing room. After blindfolding Garcia with a bandana, and tying her hands in front of her with zip-

5

ties, they closed the dressing room curtain. After a little while, Garcia pulled the bandana down from her eyes and opened the curtain. She saw the two men putting store merchandise into a big, black plastic bag. Garcia escaped from the dressing room and went to the back of the store through an unlocked door which she slammed shut and locked. She heard the men say, "She's gone." When Garcia came back into the store, she saw the men had taken between 35 and 50 baseball caps, three pairs of jeans and a lot of Pro Club brand merchandise. The men had also taken money from the cash register. A recording of the robbery taken by the store's two surveillance cameras was played for the jury; still photos captured from the video were also introduced into evidence. In the photos, one of the robbers is wearing a blue Dodgers jacket and a two-tone baseball cap. A few days later, Garcia was shown six-packs from which she identified Estella as the woman who entered her store just before the robbers; Garcia could not identify the male robbers because their faces had remained covered.

Police responding to the scene found a bandana, zip-tie and black plastic trash bag on the floor of the store, all of which were booked into evidence. Criminalist Forrest Yumori obtained reference DNA samples from Diaz, Velasco and Estella, as well as victim Garcia, in order to compare those reference samples to DNA found on the bandana, zip-tie and trash bag found at the scene. Yumori concluded that Estella's DNA was on the bandana; tests were inconclusive as to whether Diaz's DNA was on the bandana; Velasco and victim Garcia were excluded as contributors of the DNA found on the bandana. Yumori was unable to obtain enough DNA from the zip-tie and the trash bag to form any conclusions as to the identity of the contributors.

The next day, at about 10:20 p.m., Diaz was driving and Velasco was a passenger in a white car which a patrol officer recognized as matching the description of the car associated with the Garcia robbery. The officer also noticed that Diaz was wearing a blue Dodgers windbreaker and two-tone baseball cap which matched the description of clothing worn by one of the robbery suspects. The officer and his partner initiated a traffic stop and photographed the items in the trunk. When another officer showed Garcia those photographs, she identified the items as some of the merchandise stolen

6

from her store. J.C., the owner of the store next to Pe-Cas, identified a photograph of the car in which Diaz and Velasco were riding when stopped as the car she had seen the two masked men running towards after the robbery. Garcia identified the Dodgers windbreaker Diaz was wearing as the jacket one of the robbers had been wearing.

On October 25, 2011, Diaz, Velasco and Estella were arrested at a house on the 1700 block of Bullard Street.[4] A black trash bag full of baseball hats was recovered inside the house. Garcia identified those hats as merchandise stolen in the robbery.

## DISCUSSION

### A.    *Substantial Evidence Supports Velasco's Conviction on Count 1 (Garcia Robbery)*

Velasco contends his conviction of the Garcia robbery is not supported by substantial evidence. He argues that "there is no strong identification of [Velasco] as one of the perpetrators . . . ." We find no merit in the contention.

The standard of review for a challenge to the sufficiency of the evidence is well settled. We review the whole record, in the light most favorable to the judgment, to determine whether there is evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. " 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.] [¶]

---

**4**      According to the People's Trial Memorandum, the house on Bullard Street where the arrest occurred belonged to Estella. During the October 15 traffic stop, Diaz said the car he was driving had been rented by his girlfriend, Estella. After she was taken into custody on October 25, Estella told police that she and Diaz planned the Garcia robbery together and that they executed it along with Velasco.

7

The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.]" (*Zamudio, supra*, 43 Cal.4th at p. 357.)

Guilt of a theft-related crime may be inferred from the fact that the defendant is found in possession of recently stolen property when accompanied by slight corroboration of other inculpatory circumstances. (*People v. Rogers* (2013) 57 Cal.4th 296, 335; see *People v. Mulqueen* (1970) 9 Cal.App.3d 532 ["It is settled that when a person is shown to be in possession of recently stolen property slight corroborative evidence of other inculpatory circumstances which tend to show guilt supports the conviction of robbery."]; see also 2 Witkin and Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against Property, § 157, p. 205 ["Circumstances that have been held sufficient corroborative evidence when coupled with possession include (a) flight; (b) false statements showing consciousness of guilt; (c) false statements as to how the property came into defendant's possession; (d) assuming a false name and an inability to find the person from whom defendant claimed to have received the property; (e) sale of the property under a false name and at an inadequate price; (f) sale of the property with marks of identity removed and failure to account for its possession; (g) giving false testimony; and (h) an effort to throw away the stolen property."].)

Here, substantial circumstantial evidence supports the jury's finding that Velasco was one of the two masked men who committed the Garcia robbery. Velasco was found in possession of recently stolen property from the Garcia robbery on two separate occasions. First, when he and Diaz were stopped the day after the robbery, stolen goods from Pe-Cas were found in the trunk of their car. Second, when he was arrested with Diaz and Estella at the house on Bullard Street, a black trash bag filled with more stolen property was found in the house. In addition, there was the following corroborative evidence: (1) the surveillance video showing Velasco, Diaz and Estella arriving at the Food 4 Less and purchasing black trash bags shortly before the robbery; (2) Velasco's association with Estella, who appeared to be "casing" Pe-Cas for the robbers; (3) Garcia's observation of the masked robbers putting the stolen merchandise into black trash bags like the ones Velasco, Diaz and Estella purchased at Food 4 Less shortly

8

before the robbery; (4) a witness's observation of two masked men running out of Pe-Cas carrying a black plastic bag and getting into the same white car which Diaz and Velasco were driving when they were stopped by police the day after the robbery; and (5) the absence of any exculpatory evidence showing how Velasco came to be in possession of the stolen merchandise. This circumstantial evidence is sufficient to support Velasco's conviction of the Garcia robbery.

B.    *Substantial Evidence Supports Diaz's Conviction on Counts 2 and 3 (Attempted Robbery and Attempted Murder of Tolentino)*[5]

Diaz challenges the sufficiency of the evidence to support his conviction of the Tolentino attempted robbery and attempted murder. He argues that out-of-court identifications by two witnesses were too uncertain to constitute substantial evidence. We disagree.

An out-of-court identification may be sufficient to support a conviction, even if the witness recants his or her identification in court. "Indeed, 'an out-of-court identification generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification: "[T]he [out-of-court] identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind. [Citations.] . . ." [Citations].' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 480 (*Boyer*), citing *People v. Cuevas* (1995) 12 Cal.4th 252, 265 (*Cuevas*).)

The sufficiency of the evidence of an out-of-court identification to support a conviction is determined under the substantial evidence test. (*Cuevas, supra*, 12 Cal.4th at p. 257.) "Under this standard, the probative value of the identification and whatever other evidence there is in the record are considered together to determine whether a

---

**5**    As to count 4, although Aldana identified Velasco and not Diaz as his assailant, Diaz was convicted of the Aldana robbery (count 4). Diaz does not challenge that conviction. Nor does Diaz challenge his conviction of count 1, the Garcia robbery.

9

reasonable trier of fact could find the elements of the crime proven beyond a reasonable doubt. [Citations.]" (*Id*. at p. 275.) Some of the circumstances to be considered in assessing the probative value of the identification are: "(1) the identifying witness's prior familiarity with the defendant; (2) the witness's opportunity to observe the perpetrator during the commission of the crime; (3) whether the witness has a motive to falsely implicate the defendant; and (4) the level of detail given by the witness in the out-of-court identification and any accompanying description of the crime." (*Id*. at p. 267.) The *Cuevas* court also identified the following circumstances as relevant to the witness's failure to identify the defendant at trial: "(1) whether the identifying witness admits, denies, or fails to remember making the out-of-court identification; (2) whether the witness remembers the underlying events of the crime but no longer believes in the accuracy of the out-of-court identification; (3) whether, if the witness claims the identification was false or erroneous, the witness offers an explanation for making a false or erroneous identification; (4) whether, if the witness claims a failure of recollection, there are reasons supporting the loss of memory; (5) whether there is evidence that the witness's failure to confirm the identification in court resulted from the witness's appreciation that doing so would result in the defendant's conviction; or (6) whether there is evidence that . . . the witness's failure to confirm the identification arises from fear or intimidation." (*Id*. at pp. 267-268.)

In *Boyer, supra*, a witness in the penalty phase of a capital murder trial identified the defendant from a six-pack as the person she had seen in the drive-thru lane of a fast-food restaurant three years before. (*Boyer, supra*, 38 Cal.4th at pp. 426-427.) The *Boyer* court found the out-of-court identification was sufficient to support the finding that the defendant had been involved in another murder even though the witness did not identify the defendant in court as the person she saw at the drive-thru window. (*Id*. at p. 480.)

Here, Diaz challenges the reliability of witnesses' out-of-court identifications of (him) as the perpetrator of the crimes against Tolentino. As we have observed Tolentino was unable to identify his assailant from a six-pack, at the preliminary hearing or at trial.

10

The identifications were based on six-packs which included Diaz in position number three (People's Exhibit Nos. 8B and 48B).

Five days after the shooting, J.L. identified Diaz on People's Exhibit No. 8B as looking "very similar" to the man with the gun she saw running to the getaway car. That same day, J.R. identified Diaz on People's Exhibit No. 48B as the person who "most resembles" the person she saw running to the getaway car. At trial, J.L. testified that Diaz "looks similar" to the gunman. J.R. could not identify Diaz at trial.[6] The People's gang expert testified that Diaz was a self-admitted member of the criminal street gang known as "El Sereno."

Under these circumstances, the witnesses' out-of-court identifications of Diaz are sufficient to support the conviction. Two unrelated witnesses independently identified Diaz as the man they saw running away from the gunshot victim to a car which quickly left the scene. Both witnesses had ample opportunity to observe the suspect and their

------

[6] Tolentino described his assailant as a light-skinned Mexican with a slightly grown out buzz cut, wearing a white shirt and a light-colored latex glove on his hand. He could not identify his assailant in the six-packs shown to him by police on October 17 and he did not recognize either of the defendants at trial. Tolentino testified that the shooter had lighter skin than Diaz.

J.L. described the man she saw running with a gun as tall, slender, Hispanic, with a light complexion, a shaved haircut and "hardly any" facial hair, wearing a white T-shirt and holding something like a cloth in his hand. J.L. did not notice whether the man had any tattoos on his arms. When shown the six-packs on October 17, J.L. identified Diaz, in position number three on People's Exhibit No. 8B, and wrote: "The person number 3 photograph looks very similar to the guy I saw on 10-12-11 with a gun running to the car." J.L. could not identify Diaz at the preliminary hearing. At trial, J.L. testified that Diaz "looks similar" to the man with the gun.

J.R. described the young man he saw getting into the getaway car as tall and slender, with a light complexion, no facial hair, almost shaved hair on his head, wearing dark clothing and with something – a cloth, T-shirt or ace bandage –wrapped around his right hand. On October 17, J.R. identified Diaz in position number three on People's Exhibit No. 48B and wrote: "#3 most resembles person I saw, 10-12-11 entering vehicle after I heard 3 shots fired. Person seen this date had his right hand wrapped with what appeared to me [as] an ace bandage (wrap)." Asked whether he saws that person in court, J.R. testified, "I'm not sure that I do." Neither defendant looked familiar to J.R.

physical descriptions of him were similar – Hispanic, tall, slender, shaved head, little or no facial hair, a glove or bandage on his right hand. Neither witness had any motive to falsely implicate Diaz. Regarding their inability to identify Diaz at trial, neither witness denied identifying him from the six-packs and both witnesses clearly remembered what they saw at the time of the shooting. Finally, from the evidence that Diaz was an admitted gang member, it is reasonable to infer that the witnesses may have been afraid to identify him in court. Under *Cuevas, supra*, at pages 267-268, the out-of-court identifications constituted substantial evidence in support of the convictions.

## C.  *Application of Section 654 to the Sentence For Attempted Robbery*

Diaz contends the sentence for attempted robbery of Tolentino should be stayed pursuant to section 654. Diaz argues the attempted murder (count 2) and attempted robbery (count 3) were comprised of a single act which cannot be sentenced twice. We disagree.

Section 654, subdivision (a) precludes multiple punishments for a single act or indivisible course of conduct. Whether a course of conduct is divisible and therefore punishable under more than one statute depends on the defendant's intent and objective. (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.) If the defendant had multiple or simultaneous objectives, he or she may be punished for each violation in pursuit of each objective. But if one offense was merely the means of accomplishing the other offense, the defendant harbored a single intent and therefore may be punished only once. (*Ibid.*) If the court makes no express section 654 finding, a finding that the crimes were divisible and thus subject to multiple punishments is implicit in the judgment and must be upheld if supported by substantial evidence. (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.) "We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Where a murder or attempted murder is committed to facilitate a robbery, section 654 generally precludes separate terms for each such "indivisible" offense. (*People v.*

12

*Bui* (2011) 192 Cal.App.4th 1002, 1015.)  But " '[a] separate act of violence against an unresisting victim or witness, whether gratuitous or to facilitate escape or to avoid prosecution, may be found not incidental to robbery for purposes of section 654.' [Citation.].)" (*People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1299 [where attempted robbery was complete when victim refused to hand over the money, § 654 did not preclude separate punishment for the defendant's subsequent shooting of victim]; see also *Bui, supra*, 192 Cal.App.4th at p. 1016 [" 'gratuitous violence against a helpless and unresisting victim,' " can be viewed as not incidental to the robbery for section 654 purposes]; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271–272 [§ 654 did not preclude separate punishments where defendant used far more force than necessary to achieve the robbery].)

Here, the evidence showed that Diaz shot Tolentino once, immediately after Tolentino refused to give up his iPod.  As Diaz was running away, he turned around and shot Tolentino twice more.  Even assuming the first shot was to facilitate the robbery, the second two shots were not.  At the time of the second two shots, the attempted robbery was complete and Tolentino, who had already been shot once in the chest, was a helpless and unresisting victim.  Under these circumstances, the second two shots were gratuitous violence and reflected Diaz's separate intent to kill.  As such, the trial court did not err in imposing separate sentences on the attempted robbery and attempted murder convictions.

## DISPOSITION

The judgments are affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.                                    GRIMES, J.

13