Filed 7/25/14  P. v. Sikivou CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B248545 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA057370) |
| v. | |
| ELENOA SIKIVOU, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  David Walgren, Judge.  Affirmed with modifications.

Katharine Eileen Greenebaum, under appointment by the Court of Appeal for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Alene M. Games, Deputy Attorneys General for Plaintiff and Respondent.

* * * * * *

A jury convicted Elenoa Sikivou of theft from an elder (Pen. Code, § 368, subd. (d), count 1),[1] grand theft of personal property (§ 487, subd. (a), count 2), and second degree burglary (§ 459, count 3).  The trial court sentenced appellant to county jail for five years and four months, comprised of the upper term of four years on count 1, a consecutive term of eight months (one-third the midterm) on count 2, and a consecutive term of eight months (one-third the midterm) on count 3.  Appellant was ordered to pay restitution in the amount of $43,000 to the victims.

Appellant contends (1) that one of her theft convictions must be reversed because both thefts occurred pursuant to one intention, one general impulse, and one plan; (2) the trial court erred when it did not stay the imposition of punishment on counts 2 and 3 pursuant to section 654; and (3) the trial court erred when it imposed consecutive sentences.

We agree that section 654 bars a separate punishment for count 3.  Finding no other errors, we affirm the judgment.

**FACTS**

**Prosecution Evidence**

> *A.      Current Offenses*

Allen Baumann is a retired Lieutenant Colonel from the United States Army. He was 73 years old at the time of trial.  Stephen Kirtley is a retired Colonel and chaplain from the United States Army.  Kirtley first met appellant in early 2007 when he ran a school for chaplains.  Appellant told Kirtley that she was glad to finally meet him because her father knew his father.  Appellant became a student in Kirtley's school and graduated with a certificate in chaplaincy.  Baumann never served with Kirtley but knew him as a chaplain and trusted him "implicitly with [his] whole heart."  Kirtley introduced Baumann to appellant and vouched for her.

---

[1]      All further statutory references are to the Penal Code unless otherwise stated.

2

Appellant told Baumann that she was a queen of a tribe in Fiji and had been part of a prior government. She claimed to have a nonprofit organization in Fiji that provided assistance in building roads, bridges, and homes. Appellant told Baumann she had $80 million in oil stocks but the money was held up in banks in Hong Kong and England. Appellant claimed to have a doctorate in theology. When she came to Baumann's home she asked everybody to hold hands and pray "that God would help to get her funds released." Kirtley told Baumann that appellant was "a very honorable religious lady" and they should help her "because she had no money to get her 80 million dollars." Appellant introduced Simon Locke, an English architect, to Baumann. Locke traveled with appellant and produced documents that appeared to verify that appellant had a large sum of money in foreign banks.

Appellant first asked Baumann for $850 which she urgently needed so that the Bank of England would release her funds. She promised Baumann he would be repaid in a few days. Baumann withdrew the money from his Wescom Credit Union (Wescom) account. Appellant continued to ask Baumann for relatively small amounts of money always on an urgent basis. She explained that she needed to pay taxes on the money in Hong Kong and England. In October 2010, appellant convinced Baumann that she needed to buy computer equipment to pursue her funds in England. Baumann met her at a computer store where appellant "picked out whatever she wanted for computers, and . . . took the best." Baumann paid for the computer equipment.

Baumann and appellant entered into several "Loan Agreements." In one agreement dated October 14, 2010, Baumann agreed to loan appellant $6,500 and appellant promised to repay him $12,000. The money was sent to England "to release" appellant's funds and the loan documents stated Baumann would be paid "as soon as possible" or "at the latest, one year from the date." In June 2011, appellant told Baumann that the Bank of England needed $20,000 to release her money. A written agreement dated June 7, 2011, stated that Baumann and his wife (Hoang Dreu Baumann) would receive one million dollars in exchange for lending appellant $20,000. The agreement

3

was signed by appellant, Baumann, and Mrs. Baumann. Appellant accompanied the Baumanns to Wescom. Baumann withdrew $7,045 in cash from his savings account which represented "all the savings [he] had" and gave the money to appellant. Mrs. Baumann had been saving money in a separate account to assist her son with a downpayment for a house. She withdrew her entire savings of $13,000 and gave the money to appellant. The loan agreement was amended to indicate the amount of the loan was increased to $22,000, and in exchange appellant agreed to deposit $500,000 in each of the Baumann's separate accounts.

Over the course of the next few months Baumann asked appellant and Kirtley when he could expect to receive his money. Appellant repeatedly told him the money was there and "it's on the way." In December 2011, appellant and Locke told Baumann that they urgently needed $80,000 to release funds from her bank. When Baumann told appellant that he had already given her all his money she suggested that he take out a mortgage on his home. After Baumann told appellant he had no more money, she stopped taking his calls and blocked calls from his land line and cell phone numbers. Kirtley told Baumann that Mrs. Baumann's calls to appellant were "annoying" her and neither Baumann nor his wife should call appellant again.

Margarita Benchikh was a loss prevention supervisor with Wescom. On June 17, 2011, she was notified that appellant had opened checking accounts at Wescom and Wells Fargo Credit Union. Benchikh was concerned that appellant was involved in a "check hiding scheme." Appellant's Wescom membership application indicated that she had been in the United States since 1999 but her social security number was issued between 2009 and 2010. Benchikh asked appellant about the discrepancy but appellant refused to answer any questions. Appellant closed her account with Wescom.

Los Angeles County Sheriff's Deputy James Moser was assigned to the Palmdale Station Detective Bureau and worked with FBI and Secret Service agents to investigate identity theft as well as fraud and elder abuse crimes. He testified as an expert on those particular types of crimes. He explained various fraud type scams including an

4

"advanced fund scheme" where the perpetrator urgently requested funds from the victim with the promise of a generous payback. When appellant was arrested, she had documents in her possession which contained lists of names, account numbers, and routing information. Responding to a hypothetical question based on the facts of this case, Deputy Moser opined that the transaction between appellant and the Baumanns was a scam.

### B. Prior Uncharged Offenses

Robert Burns met Kirtley through his church and Kirtley introduced him to appellant. Burns learned that appellant was trying to recover a large sum of money that was "unavailable to her." Burns paid for appellant's living expenses and lawyers and estimated he gave her approximately $33,000. Appellant needed an additional $80,000 and Locke prepared a document to allow Burns to borrow the money from Burns's retirement account. After Burns decided he would not borrow the money, he lost contact with appellant and Locke.

In early 2005, Robert Henkel, a venture capitalist, attended a seminar in Pasadena. Appellant interviewed various companies in attendance and indicated that she was very wealthy and interested in investing in startup companies. Appellant told Henkel she was interested in his company but needed $5,700 to pay transfer fees for her money which was tied up in foreign banks. Henkel gave her the money. She promised to repay the money immediately and invest half a million dollars in his company followed by another half a million dollars a week later. A few months later Henkel visited appellant in New York at her request. He stayed four weeks and paid $27,000 for her hotel room, his room, and incidentals. When he returned home, he received a fax from the World Bank in Switzerland signed by "Mr. Larson" which indicated that appellant's money was at Chase Manhattan but appellant would need $30,000 to access it. When Henkel called the telephone number on the letterhead, he was informed that "Mr. Larson" did not work for the World Bank.

**Defense Evidence**

Stephen Kirtley introduced appellant to Baumann and "helped her connect with people" that were his friends. Kirtley gave her money to help her with living expenses. He estimated he gave her "thousands of dollars" out of the "goodness of his heart."

Simon Locke met appellant at a church in Pasadena in 2010. He had no doubt appellant had substantial funds based on the documents he saw. His relationship with appellant was "somewhere between business partners and partners." He accompanied appellant when she sought financial assistance from other people. He gave appellant approximately $100,000 over time to help her access her money and he expected appellant to repay him soon.

Appellant testified that she never personally solicited money because she was "not that kind of person." She stated that Locke and Kirtley wanted to help her. She did not deny any of the transactions and stated she intended to repay all of the loans.

## DISCUSSION

### I. Appellant Was Properly Sentenced for Multiple Theft Convictions

Appellant does not challenge the sufficiency of the evidence to support her convictions of theft from an elder (Allen Baumann) and grand theft (Hoang Dreu Baumann). Instead, she contends that she should have been convicted of only one count of theft instead of two counts because she acted pursuant to one general plan and intent to obtain money from the Baumanns. Appellant's argument is based on *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*) and its progeny.

In *Bailey*, the California Supreme Court held that where as part of a single plan a defendant makes false representations and receives various sums of money, each of which is an amount less than that required for a grand theft, these petty thefts may be cumulated to constitute one offense of grand theft. (*Bailey, supra*, 55 Cal.2d at pp. 518-520.) The *Bailey* court also stated that a defendant may not be convicted of more than one count of grand theft where all of the takings are committed against a single victim, with one intention, one general impulse, and one plan: "Whether a series of

6

wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey, supra,* at p. 519.)

The facts and analysis in *Bailey* concerned multiple takings from the *same* victim. Based on *Bailey*, numerous courts have applied the one-plan/one-offense standard to determine whether a series of takings from a single victim could support only a single grand theft conviction. Whether a person may suffer multiple grand theft convictions for multiple takings or whether the takings always constitute a single offense under *Bailey* is presently under consideration by the California Supreme Court in *People v. Whitmer* (2013) 213 Cal.App.4th 122, review granted May 1, 2013 (S208843).) To determine the issue presented to us by appellant, we need not anticipate the Supreme Court's analysis of that issue because, for the reasons stated below, we conclude appellant was properly charged with and convicted of separate theft counts from Mr. and Mrs. Baumann.

Application of *Bailey* has been limited generally to thefts involving a single victim. (*People v. Slocum* (1975) 52 Cal.App.3d 867 (*Slocum*); *People v. Sullivan* (1978) 80 Cal.App.3d 16 (*Sullivan*); *People v. Gardner* (1979) 90 Cal.App.3d 42 (*Gardner*); *People v. Ramirez* (1980) 109 Cal.App.3d 529; *People v. Packard* (1982) 131 Cal.App.3d 622; and *People v. Kronemyer* (1987) 189 Cal.App.3d 314.) *Bailey* seems to imply aggregation may occur only when the offense was committed against one victim. "[W]here as part of a single plan a defendant makes false representations and receives various sums from the *victim* the receipts may be cumulated to constitute but one offense of grand theft. . . ." (*Bailey, supra,* 55 Cal.2d at p. 518, italics added.) The authorities upon which *Bailey* relies to reach its conclusion describe offenses against a single victim,[2] and the court later notes aggregation is inappropriate, even though the thefts

---

[2] *People v. Robertson* (1959) 167 Cal.App.2d 571; *Dawson v. Superior Court* (1956) 138 Cal.App.2d 685; *People v. Lima* (1954) 127 Cal.App.2d 29; *People v.*

7

occurred against a single person, if the facts fail to establish one plan or intention. (*Bailey, supra,* at p. 519.) This observation presupposes a single victim as does the *Bailey* court's reliance upon *Sing, supra,* 42 Cal.App.385, in which the court held "[t]he law is that if the different asportations from the *same owner* are prompted by one design, one purpose, one impulse, they are a single act, without regard to time." (*Sing, supra*, at p. 396, italics added.)

In support of her assertion that both counts of theft should be aggregated, appellant emphasizes that the Baumanns signed "one agreement" and agreed to lend her money "as a couple." But the evidence is to the contrary and supports separate offenses. The count of grand theft from Mrs. Baumann involved one specific transfer of $13,000 on June 7, 2011. Appellant originally asked Mr. Baumann for $20,000 but Baumann did not have sufficient funds left to make that loan and Mrs. Baumann was asked to lend money to appellant. Mrs. Baumann signed the loan agreement. Appellant agreed to repay Mr. and Mrs. Baumann by depositing $500,000 in each of their respective separate accounts. Mrs. Baumann testified that the $13,000 she withdrew from her separate account and gave to appellant was intended to assist her son from a different marriage with the purchase of a home.

In contrast, the count of grand theft from an elder involved multiple occasions where Mr. Baumann gave appellant money. It included the withdrawal of $7,045 from his separate savings account on June 7, 2011, and cash advances on his credit cards.

*People v. Brooks* (1985) 166 Cal.App.3d 24 (*Brooks*), cited by appellant in support of her assertion that *Bailey* applies to multiple grand thefts against multiple victims, does not compel a contrary conclusion. The defendant in *Brooks* was charged with 14 counts of grand theft after he accepted items on consignment for an auction but did not give the proceeds of the sales to the original owners of the items. *Brooks*, which relied on *Bailey*,

---

*Fleming* (1934) 220 Cal. 601; *People v. Howes* (1950) 99 Cal.App.2d 808; *People v. Yachimowicz* (1943) 57 Cal.App.2d 375; *People v. Dillon* (1934) 1 Cal.App.2d 224; and *People v. Sing* (1919) 42 Cal.App. 385 (*Sing*).

noted that *Brooks's* conclusion that reversal of 13 of 14 convictions for grand theft (in a case in which the thefts were the product of a general intent or overall plan) was not altered by the fact there were multiple victims (*Brooks, supra*, 166 Cal.App.3d at p. 31). However, in *Brooks* all thefts had occurred *from a single fund* – (the auction) – to which all of the victims had contributed. (*Ibid.*) Unlike *Brooks*, the thefts committed by appellant were from Mr. and Mrs. Baumann's separate and individual savings accounts.

Although appellant urges us to find that takings from multiple victims could constitute one theft offense, appellant cites no case holding *Bailey* requires such a finding when, as here, the victim as to each count *exclusively possessed* the personal property taken. Appellant was properly convicted of and the trial court properly sentenced appellant on both theft counts because they were distinct offenses against separate victims.

## II. The Sentence on Count 3 Must Be Stayed; Section 654 Does Not Require That The Sentences On Counts 1 and 2 Be Stayed

Appellant contends the court erred in failing to stay the imposition of sentence on counts 2 and 3 pursuant to section 654 because the crimes were part of an indivisible course of conduct.

### A. *Relevant Proceedings*

The jury found that appellant committed two counts of grand theft (counts 1 & 2) and one count of burglary (count 3). Trial counsel argued that section 654 should apply to appellant's multiple convictions. The court disagreed and selected count 1 as the base term and sentenced appellant to the upper term of four years. On count 2, the court sentenced appellant to one-third the middle term, or eight months, and ordered that the sentence be served consecutively to the sentence imposed in count 1. On count 3, the court sentenced appellant to one-third the middle term, or eight months, and ordered that the sentence be served consecutively to the sentence imposed in count 1. Appellant was sentenced to a total term of five years and four months.

9

### B. Applicable Law

Section 654 bars multiple punishments where "there was a course of conduct that violates more than one statute but nevertheless constitutes an indivisible transaction." (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240 (*Hairston*).) If a defendant commits more than one offense, but "'all the offenses were incident to one objective, the defendant may be punished for any one of such offenses, but not for more than one.' (*People v. Perez* (1979) 23 Cal.3d 545, 551.)" (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1214-1215, emphasis omitted.) "Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor." (*Hairston, supra,* 174 Cal.App.4th at p. 240.) The amount of time that elapses between criminal acts, "although not determinative on the question of whether there was a single objective, is a relevant consideration." (*People v. Martin* (2005) 133 Cal.App.4th 776, 781.) Whether multiple convictions were part of an indivisible transaction is primarily a question of fact. (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1583.) We review such a finding under the substantial evidence test. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.)

### C. The Sentence on Count 3 Must Be Stayed

The People agree with appellant that the trial court should have stayed sentence on the count 3 conviction pursuant to section 654. We also agree. (*People v. McFarland* (1962) 58 Cal.2d 748, 762 ["burglary although complete before the theft was committed, was incident to and a means of perpetrating the theft"].) Appellant's convictions for grand theft (count 2) and burglary (count 3) were based on Mrs. Baumann's transfer of $13,000 on June 7, 2011, from her savings account at Wescom Credit Union to appellant. Since the intent and objective for the burglary was the same as for the grand theft, the sentence for the former should be stayed pursuant to section 654.

10

## D. Sentences Were Properly Imposed on Counts 1 and 2 Because They Were Separate Distinct Crimes With Separate Victims

Appellant contends that Mr. and Mrs. Baumann constituted one victim for section 654 purposes, arguing that the "grand theft from Mrs. Baumann was part of the same course of conduct as . . . theft from an elder, Baumann."

"Notwithstanding the apparent simplicity of its language, the applicability of section 654 in a particular case often involves a difficult analytical problem. [Citation.] Each case must be determined on the basis of its own facts, and general principles applicable to one type of case may not apply to another." (*In re Adams* (1975) 14 Cal.3d 629, 633, discussing the application of section 654 to narcotics offenses only.)

While appellant's ultimate objective in taking money from Mr. and Mrs. Baumann was to steal, substantial evidence supports the trial court's refusal to apply section 654 to counts 1 and 2. As discussed *ante*, appellant committed grand theft from Mr. Baumann, an elder, (count 1) on multiple occasions. The charged incidents occurred on June 7, 2011, when Mr. Baumann gave appellant $7,045 from his Wescom account, and shortly thereafter when he gave appellant an additional $2,000.[3] However, there were other instances when Mr. Baumann gave appellant money. Mr. Baumann testified that appellant needed money to buy computer equipment and on numerous occasions requested money to pay taxes to banks in Hong Kong and England. As the trial court observed, appellant's crime was "continuous and ongoing."

On the other hand, the theft from Mrs. Baumann was a factually separate and distinct act from the thefts from Mr. Baumann. Mrs. Baumann testified she told appellant that $13,000 was everything she had and "before [she] die[d]" she wanted to help her son with the purchase of a home. Appellant understood and promised to repay Mrs. Baumann in a "couple of weeks."

---

[3]     The evidence showed that although the Baumanns emptied their separate savings accounts and gave appellant $7,045 and $13,000 respectively, on June 7, 2011, the loan agreement was amended to indicate the amount of the loan was $22,000.

11

The intent of section 654 is to ensure that punishment is commensurate with culpability. (*People v. Perez, supra,* 23 Cal.3d 545, 552.) However, as *Perez* points out, this concept works both ways. It is just as undesirable to apply the statute to lighten a just punishment as it is to ignore the statute and impose an oppressive sentence. The evidence supported a finding that appellant engaged in a single theft from Mrs. Baumann that was separate and distinct from the ongoing elder theft committed against Mr. Baumann.

## III.    The Trial Court Did Not Abuse Its Discretion in Ordering Consecutive Rather Than Concurrent Sentences

Appellant contends that the trial court abused its discretion by sentencing her to consecutive terms on counts 1 and 2.

Defense counsel filed a sentencing memorandum asking the court to impose the middle term of three years on count 1, and concurrent sentences for counts 2 and 3. At the sentencing hearing, the trial court sentenced appellant to the maximum term. The court found the victims "were particularly vulnerable" and that appellant "took advantage of a position of trust." The court found the crimes showed planning, sophistication, and professionalism, "had been going on for years" and involved a "large sum of money." Taking into account appellant's conviction in New York "for the same exact offense," the court concluded that the maximum sentence was "the only just sentence based on the evidence that was presented in this case and based upon the damage [appellant] done to people who again only tried to help [her]."

Section 669 grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes. (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458.) California Rules of Court, rule 4.425 sets forth criteria affecting concurrent or consecutive sentences.[4] Those criteria are guidelines, not rigid rules that

---

[4]    California Rules of Court, rule 4.425 provides: "Criteria affecting the decision to impose consecutive rather than concurrent sentences include: [¶] (a) Criteria relating to crimes [¶] Facts relating to the crimes, including whether or not: [¶] (1) The crimes and

trial courts are bound to apply in every case. (*People v. Calderon* (1993) 20 Cal.App.4th 82, 86-87.) The enumeration in the rules of some criteria for the making of discretionary sentencing decisions does not prohibit the application of additional criteria reasonably related to the decision being made. (Cal. Rules of Court, rule 4.408(a).) Any circumstances in aggravation or mitigation may be considered in determining whether to impose consecutive rather than concurrent sentences, except a fact used to impose the upper term; a fact used to otherwise enhance the defendant's prison sentence; and a fact that is an element of the crime. (Cal. Rules of Court, rule 4.425.)

In deciding to sentence appellant to the upper term on count 1, the court identified several factors in aggravation: the victims were vulnerable; appellant took advantage of a position of trust; the crimes showed planning and sophistication and had been going on for years; and appellant's prior conviction for the "same exact offense." The trial court never expressed or implied that it somehow lacked the discretion to impose concurrent terms of imprisonment. The court expressly noted that "the maximum punishment [was] appropriate" and was "the only just sentence based on the evidence."

A trial court has discretion to determine whether several sentences are to run concurrently or consecutively. Absent a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal. Discretion is abused when the court exceeds the bounds of reason, all of the circumstances being considered. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.) Only a single aggravating circumstance is required to impose consecutive sentences. (*People v. Leon* (2010) 181 Cal.App.4th 452, 469.)

---

their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior. [¶] (b) Other criteria and limitations [¶] Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences." (Boldface omitted.)

Having identified at least two factors that would support the imposition of the upper term and consecutive terms, it cannot be said the trial court abused its broad discretion in sentencing appellant to consecutive terms. (Cf. *People v. Osband, supra,* 13 Cal.4th at pp. 728-729 ["Only a single aggravating factor is required to impose the upper term [citation], and the same is true of the choice to impose a consecutive sentence [citation]. In this case, the court could have selected disparate facts from among those it recited to justify the imposition of both a consecutive sentence and the upper term, and on this record we discern no reasonable probability that it would not have done so. Resentencing is not required."].)

## DISPOSITION

The judgment is modified to reflect the sentence on count 3 is stayed pursuant to section 654, and, as so modified, is affirmed. Accordingly, the trial court is ordered to prepare and forward to the California Department of Corrections and Rehabilitation a modified abstract of judgment.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J. *

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

ASHMANN-GERST

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14